SAN FRANCISCO SAV. UNION and others *v.* IRWIN.

*(Circuit Court, D. California. July 8, 1886.)*

1. PUBLIC LANDS—ACT OF CONGRESS OF SEPTEMBER 20, 1850—SWAMP AND OVER-
   FLOWED LANDS.
   The act of congress of September 20, 1850, granting to each state then in
   the Union its swamp and overflowed lands, effected an immediate transfer
   of interest, which cannot be defeated nor in any way impaired by the delay
   or refusal of the secretary of the interior to have the required list made and
   patent issued.

2. SAME—ISSUE OF PATENT—PAROL TESTIMONY.
   Wherever the secretary of the interior has made out and certified a list of
   the swamp and overflowed lands as required by the act of congress of Sep-
   tember 20, 1850, which confers them upon the state in which they are situated,
   and has issued the patent, his determination is so far conclusive as to the
   character of the land that it cannot be collaterally attacked; but where he has
   failed to make such list, and to issue the patent, it is competent for the state,
   or parties claiming from it, to prove by parol testimony that the land is of
   the character mentioned in the act of 1850.

3. UNITED STATES AND EXECUTIVE DEPARTMENT—NAVY OFFICER—UNJUSTIFIA-
   BLE RETENTION OF PROPERTY.
   The fact that one is an officer of the navy of the United States, and is act-
   ing under their orders, gives no justification for the retention of the premises
   against the claim of the true owner.

4. WATERS AND WATER-COURSES—ISLANDS—LIMIT TO PRIVATE OWNERSHIP.
   Private ownership of the land of Mare island did not, under the grant of
   the Mexican government, extend to lands regularly covered each month by
   the flow of the tides.

5. UNITED STATES AND EXECUTIVE DEPARTMENTS—STATUTE OF LIMITATIONS.
   Legal proceedings to enforce the claim of a citizen to lands in possession
   of the United States cannot be taken, and the statute of limitations cannot
   run against one to whom the courts are thus closed for the maintenance of
   his claim.

At Law.

*S. O. Houghton* and *Geo. A. Nourse,* for plaintiff.

*S. G. Hilborn,* U. S. Atty., and *A. L. Rhody,* for defendant.

Before FIELD, Justice, and SAWYER, J.

FIELD, J. This is an action to recover possession of a tract of
land situated partly in the county of Napa, and partly in the county
of Solano, consisting of 7,413 acres and a fraction of an acre. It is
alleged to be swamp and overflowed land, and that the title to it
therefore passed to the state by the act of congress of September
28, 1850, "to enable the state of Arkansas and other states to re-
claim the swamp lands within their limits." 9 St. 519.

The first section of that act grants to the state of Arkansas "the
whole of those swamp and overflowed lands, made unfit thereby for
cultivation," which were unsold at the date of its passage. The
fourth section extends the provisions of the act to; and confers their
benefits upon, each of the other states of the Union in which swamp
and overflowed lands are situated.

The act is a grant *in præsenti,* to each state then in the Union, of
lands situated within its limits of the quality described. Its lan-

guage is that they "shall be, and the same are hereby, granted to said state,"—words which import an immediate transfer of interest, and not one in the future.

The provisions of the second section, making it the duty of the secretary of the interior, as soon as practicable after the passage of the act, to make out an accurate list and plat of the lands described, to transmit the same to the governor of the state, and, on his request, to cause a patent to be issued to the state, and declaring that "on that patent the fee-simple to said lands shall vest in the state," subject to the disposal of the legislature thereof, did not prevent the immediate passing of the title. The patent, with the definite description by metes and bounds of the lands which it would furnish, would serve a useful purpose. It would render it unnecessary for the state, or grantees from the state, to make any further proof of the character of the land should any controversies arise respecting it. In many ways, doubts might be created on the subject. The evidence might be conflicting as to whether the greater part of a legal subdivision fell within the description required, as being "wet and unfit for cultivation." In all such cases the patent would solve the doubt; for the determination, in that respect, of the secretary of the interior would be controlling. The ascertainment and designation of the lands, as those described, would be conclusive as against collateral attack. But the title of the state to the lands, they being swamp and overflowed, cannot be defeated, nor in any way impaired, by the delay or refusal of the secretary of the interior to have the required list made and patent issued. The state and her grantees might be embarrassed in the assertion of their rights, but no other consequence would follow.

Such is the purport of the advice given to the secretary of the interior by the attorney general of the United States in his communication of November 10, 1858. "It is not necessary," he said, "that the patent should issue before the title vests in the state under the act of 1850. The act of congress was itself a present grant, wanting nothing but a definition of boundaries to make it perfect; and to attain that object the secretary of the interior was directed to make out an accurate list and plat of the lands, and cause a patent to be issued therefor; but, when a party is authorized to demand a patent for land, his title is vested as much as if he had the patent itself, which is but evidence of his title." 9 Op. Attys. Gen. 254.

Such is also the purport of several decisions of the supreme court of California. In *Owens* v. *Jackson*, 9 Cal. 322, which was an action, like the present one, for the possession of swamp and overflowed lands under a patent of the state, the defendant demurred to the complaint because it did not show that the land had been surveyed and patented to the state. The demurrer was sustained in the court below, but the supreme court reversed the decision, holding that the state had the right to dispose of the swamp and overflowed lands

granted to her by the act of 1850, prior to a patent from the United States, so as to convey a present title to the patentee as against a trespasser. "The act of congress," said the court, "describes the land, not by specific boundaries, but by its quality, and is a present legislative grant of all the public lands within the state of the quality mentioned. The patent is matter of evidence and description by metes and bounds. The office of the patent is to make the description of the lands definite and conclusive, as between the United States and the state." See, also, *Summers* v. *Dickinson*, 9 Cal. 554, and *Kernan* v. *Griffith*, 27 Cal. 87.

In *Railroad Co.* v. *Smith*, 9 Wall. 95, the question was presented to the supreme court of the United States whether the grant by the act of congress of June 10, 1852, to Missouri, of lands to aid in the construction of certain railroads, covered the swamp and overflowed lands granted to her by the act of September 28, 1850, no patent for those lands having been issued to her. After observing that there was a present grant by congress of certain lands to the states within which they lie, but by a description requiring something more than a mere reference to townships, ranges, and sections to identify them, and that it was made the duty of the secretary of the interior to ascertain the character of the lands, and furnish the state with evidence of it, the court said:

"The right of the state did not depend on his action, but on the act of congress; and, though the states might be embarrassed in the assertion of this right by the delay or failure of the secretary to ascertain and make out lists of these lands, the right of the states to them could not be defeated by that delay."

And the court further observed that, as the secretary had no satisfactory evidence under his control to enable him to make out these lists, he must, if he attempted it, rely on witnesses whose personal knowledge enabled them to report as to the character of the tracts claimed to be swamp and overflowed; that "the matter to be shown is one of observation and examination; and whether arising before the secretary, whose duty it was primarily to decide it, or before the court, whose duty it became because the secretary had failed to do it, this was clearly the best evidence to be had, and was sufficient for the purpose."

In *French* v. *Fyan*, 93 U. S. 169, this subject is further considered, and the circumstances under which parol evidence to show that lands claimed as swamp and overflowed will be received, are stated with greater precision. That was an action of ejectment for swamp and overflowed lands, and the only question raised related to the refusal of the court below to receive oral testimony to impeach the validity of a patent issued by the United States to the state of Missouri for the land in question under the act of 1850; the purpose of the testimony being to show that the land in controversy was not, in point of fact, swamp land within the meaning of that act. The land had

been certified, in 1854, to the Missouri Pacific Railway Company as part of the land granted to aid in the construction of its road by the act of June 10, 1852, and the plaintiff had become vested with the title of the company. To overcome this title, the defendant gave in evidence the patent to the state under the swamp-land act, under which he claimed by regular conveyances. The plaintiff then offered to prove, by witnesses who had known the character of the land in dispute since 1849, that it was never wet and unfit for cultivation. The court below refused to receive the testimony, and the propriety of its ruling was thus brought before the supreme court. After observing that it had been more than once decided that the swamp-land act was a grant *in præsenti,* by which the title to those lands passed at once to the state in which they lay, except as to states admitted to the Union after its passage, and that the patent, therefore, which is the evidence that the lands contained in it had been identified as swamp lands, relates back and gives certainty to the title as of the date of the grant, the court said that by the second section of the act the power and duty devolved upon the secretary of the interior, as the head of the department which administered the affairs of the public lands, of determining what lands were of the description granted, and made his office the tribunal whose decision on this subject was to be controlling, and it was his duty to have accurate lists and plats of the lands described made out and transmitted to the governor of the state, upon whose request a patent was to be issued. Parol evidence to show that the land covered by the patent to the state was not swamp and overflowed land was therefore held to be inadmissible. In commenting upon the case of *Railroad Co.* v. *Smith,* 9 Wall. 95, which was supposed to justify the offer of the parol testimony, the court said that "the admission of the testimony in that case was placed expressly on the ground that the secretary of the interior had neglected or refused to do his duty; that he had made no selections or lists whatever, and would issue no patents although many years had elapsed since the passage of the act." "There was no means," it added, "as this court has decided, to compel him to act. If the party claiming under the state in that case could not be permitted to prove that the land which the state had conveyed to him as swamp land was in fact such, a total failure of justice would occur, and the entire grant of the state might be defeated by this neglect or refusal of the secretary to perform his duty."

The result of these two cases in the supreme court is this: That wherever the secretary of the interior has acted, and certified the lists required by the act of 1850, and issued the patent, his determination is so far conclusive, as to the character of the land, that it cannot be collaterally attacked. But, where he has failed to make such list and issue the patent, it is competent for the state, or parties claiming from her, to prove by parol testimony that the land is of the character mentioned in the act of 1850, which passed to her.

On the seventh of April, 1874, the state, through her properly authorized officers, issued a patent of the tract in controversy to one George W. Pearson, describing it as swamp and overflowed land, and giving its metes and bounds. Through him, by various mesne conveyances, the plaintiffs trace their title, each having acquired an undivided one-third interest in the premises as tenant in common with the others. The state, by various enactments, had provided for the sale of lands of this character, and no question is made as to the conformity of the proceedings with their requirements in the issue of the patent. The objection taken is to the acquisition of any title by the state until the lands had been listed and patented to her by the United States. The patent of the state is the conveyance of whatever interest she had at that time in the land; and, if it were within the description of swamp and overflowed land, her interest was paramount to that of the United States, unless their title antedates the act of 1850. An attempt was made at the trial to show that it passed as an appurtenant to Mare island under the alleged Mexican grant to Castro, of which we shall hereafter speak. Laying that aside for the present, the question is, was the tract swamp and overflowed land within the act of 1850? In the absence of any action of the secretary of the interior which would be conclusive in the matter as against collateral attack, the testimony of witnesses having knowledge of the subject as to the character of the land was admissible under the decisions mentioned. That testimony clearly showed that the land was subject to periodical overflow by the rising of the tides in the bay of San Pablo, so as to make it unfit to raise the ordinary crops of the country without protecting it with levees from such overflow. The act of 1850 grants swamp *and* overflowed lands. Swamp lands, as distinguished from overflowed lands, may be considered such as require drainage to fit them for cultivation. Overflowed lands are those which are subject to such periodical or frequent overflows as to require levees or embankments to keep out the water, and render them suitable for cultivation. It does not make any difference whether the overflow be by fresh water, as by the rising of rivers or lakes, or by the flow of the tides. When drainage, reclamation, or leveeing is necessary to enable the farmer to use them for some of the ordinary purposes of husbandry, the lands are within the terms of the act of congress, and the title passed by it to the state. The patent of the state is thus *prima facie* evidence that the land embraced by it is of the character represented, and the testimony on the subject is without contradiction. Indeed, we do not understand that the defendant questions its force; he denies only its relevancy and competency. The main defense is founded on the theory that until the land is listed to the state, and patented by the United States, no title to the state passes. For the reason expressed this position is not tenable.

The other defenses are that the defendant holds possession of the premises, as commander of the navy yard at Mare island, for the

United States, and that they have title to the premises in controversy under a grant of the island to Victor Castro by the Mexican government, and sundry mesne conveyances from him; and that the action is barred by the statute of limitations of the state. Neither of these defenses is, in our judgment, tenable.

The fact that the defendant is an officer of the navy of the United States, and is acting under their orders, gives no justification to the retention of the premises against the claim of the true owners. The government of the United States is one of law, and their officers cannot deprive any citizen of his property except as the law authorizes it, and no law can authorize it except upon just compensation to the owner. This subject has been so fully considered in the learned and exhaustive opinion of the supreme court delivered by Mr. Justice MILLER in the recent case of *U. S.* v. *Lee*, generally known as the "Arlington Case," that nothing could be added by us. 106 U. S. 196, and 1 Sup. Ct. Rep. 240. Its reasoning is conclusive.

The alleged grant to Victor Castro by the Mexican government covers only Mare island. The decree of confirmation rendered by the United States land commission, May 8, 1852, describes the premises thus:

"The place of which confirmation is hereby given is situated in the bay of San Francisco, [San Pablo,] and is called the ' *Isla de la Yegua*,' or ' Mare Island,' and, being an island, is *bounded by the water's edge.*"

An appeal was taken from the decree to the district court of the United States, but what action was there had upon it does not appear. The answer alleges that the title was confirmed by that court on the second of March, 1857, but no record of the fact, if such were the case, was produced. Assuming that it was confirmed, the title recognized was only to the island, "bounded by the water's edge." Without these words, the island could not be extended beyond the water's edge. By the common law—and by that law must decrees written in the English language be interpreted—the boundary of the island, so far as its ownership as private property is concerned, is determined by ordinary high-water mark. The shore, which belongs to the public, is the line between that mark and low-water mark, over which the daily tides ebb and flow. *U. S.* v. *Pacheco*, 2 Wall. 589; 3 Kent. Comm. 427. If we could pass over the language of the decree, and apply the rule of the civil law, assuming that it was in force in California at the date of the grant, the extent of the land of the island susceptible of private ownership would be less than under the rule of the common law. Under neither could the private ownership of the land of the island extend to lands regularly covered each month by the flow of the tides. Such ownership was all that was conceded by the grant to Castro, and the decree affirming the claim of his grantees under it. Large portions of the land in controversy are also separated from the island by navigable sloughs.

Previously to August 31, 1852, the title which Castro possessed

had become vested, by various mesne conveyances, in William H. Aspinwall and George W. P. Bissell, who on that day presented a petition to the board of land commissioners under the act of March 3, 1851, for the settlement of private land claims in California, praying for a confirmation of their claim under that grant. The decree of May 8, 1852, from which we have quoted, confirming the claim, was made upon their petition. On the fourth of January, 1853, they sold and conveyed the island to the United States; describing it as "all that tract of land called and known as 'Mare Island,' in the bay of San Pablo, as recently surveyed by the board of officers of the United States sent to California for the selection of a site for a navy-yard there, *including all the tule or low and marsh land belonging to the same, or which has ever been reputed or claimed to belong to the same.*"

This description is more extensive than the one given in the grant to Castro, or by the commissioners in the decree confirming the claim under it. Nothing is said, in either grant or decree, of tule or low or marsh land belonging to the island, or which has been reputed or claimed to belong to it. These words are of the vaguest character. Whatever may have been intended by them, certain it is that the grantors, Aspinwall and Bissell, could only convey what they acquired under the grant, and the United States took, and could only take, such interest; and that, as we have seen, was limited to the island, bounded by the water's edge.

From the date of that conveyance the United States have been in possession of the island, and have constructed there large and expensive buildings for the uses of the navy, including a navy-yard. They have also occasionally asserted ownership over the adjacent overflowed lands, but the acts done by them were not of a character to indicate any settled purpose of occupying the lands, or devoting them to any public uses. They have not constructed any levees to prevent their overflow, or made any efforts to reclaim the lands, or to subject them to any uses of the government. Two shanties, 10 by 12, erected in 1874 or 1875 on the lands nearly eight miles distant from the island, were soon abandoned, and no other buildings have been erected on them. It is plain that the acts which the United States are said to have done to mark their control of the overflowed lands, if done by a private party, would not bar the plaintiffs from asserting their right of possession. There was on their part no such possession as would set the statute of limitations running, and which in time might ripen into a title against the true owners. It was not open, exclusive, and continuous, such as to give notice to the owners of an intention to claim title adversely to them; and the testimony indicates that the plaintiffs were ignorant of any adverse claim on the part of the United States till a short time before the commencement of this suit. It was not accompanied by any of the ordinary acts indicating ownership, and at no time were any such acts done except in the instance mentioned, where the two shanties were constructed, but soon afterwards abandoned.

But, independently of this consideration, we doubt very much whether the United States can acquire title by adverse possession against the right of a private citizen. The theory that an open and uninterrupted possession of land by a party, not being the real owner, may ripen into title, is founded upon the supposed acquiescence of the owner in the claim of the occupant by his not entering upon the property, or taking legal proceedings to recover its possession. Statutes of limitation do not run against the United States except when expressly provided by congress, and no action will lie against them by a private citizen except by their consent. Legal proceedings to enforce the claim of a citizen to lands in possession of the United States could not, therefore, be taken, and no statutes can run against one to whom the courts are closed for the maintenance of his claim. Nor could the citizen assert his claim to such lands by entering upon them. There can be no private entry upon land for the assertion of one's rights, where the law does not allow an action against the occupant for the possession. In the present case the United States are not sued. They cannot be sued. The defendant is not sued in his official character, but as an individual. He is alleged to be in possession. He admits that he is, and justifies that possession by alleging that he is an officer of the United States, and acting under their authority. He can only make good this defense by showing that the United States were lawfully authorized to put him in possession of the land, and such authority they only possessed if they held the title, or had the assent of the owner, neither of which is shown in the present case.

We do not give any weight to the fact that in 1853, by order of the president of the United States, Mare island was reserved, with all its alleged appendages of tule or marsh lands ordinarily reputed to belong to such island; for, if such reservation was intended to include all the swamp and overflowed lands in controversy, it was to that extent inoperative,—the title, as we have already seen, having passed to the state by the act of September 28, 1850.

It follows from what we have said that findings must be had upon all the issues in favor of the plaintiffs, and judgment entered thereon in their favor for the possession of the premises in controversy.