## HECKMAN v. SWETT et al.

### No. 14,999; August 16, 1893.

33 Pac. 1099.

**Islands—Boundaries.—Act of April 28, 1855, to Provide for the** sale of the swamp and overflowed state lands (section 18), limits the provisions of the act to the swamp lands granted to the state by act of Congress, September 28, 1850, under which lands owned by the state by virtue of its sovereignty, including the beds and shores of navigable streams below high-water mark, could not be sold or conveyed. Held, that patents of certain surveys of such swamp lands on Eel river, issued after the channel in such river was changed by a freshet, which described the lands as bounded on such river, conveyed to the grantees the land to high-water mark only, according to the new channel, and did not convey any part of an island formed on the opposite side of such channel by the change, though part of such island is within the lines of the original surveys made prior to such change.

**Islands—To Whom Belong.—Where Such Island Does not Consist** of part of such original surveys left intact by the change in the channel, but was formed of deposits within the lines of such surveys, the island is the property of the state, under Civil Code, section 1016, which provides that islands and accumulations of land, formed in the beds of navigable streams, belong to the state, if there is no title or prescription to the contrary.

**Island—Right to Fishing Privilege.—Statutes of 1859, page** 298, entitled "An act to regulate salmon fisheries on Eel river in Humboldt county" (section 2), provides that the owners of land fronting such river shall have exclusive right and privilege of casting, hauling and landing seines and nets on their own waterfronts; and, for the purposes of this act, all bars and the bed of such river lying between the lines of the official survey and extreme low-water mark shall be deemed and held to be the waterfront of the land owner whose lines border on such river or run nearest thereto. Held, that where the bed of such old channel is above low-water mark, but below high-water mark, the owner of the land separated from such island by the old channel has the exclusive right to the fishing privilege on such island.[1]

---

[1] Cited, with other cases, in State v. Mallory, 73 Ark. 247, 67 L. R. A. 773, 83 S. W. 959, in support of the court's holding that the owner of land has, by virtue of being such, a special property right to take fish and wild game on the land so owned subject only to the state's right and ownership maintained to regulate and preserve game for the common benefit.

Island—Right to Fishing Privilege.—Since the Owners of the Land separated from the island by the new channel owned no part of the island, they could acquire no right to the fishing privilege by adverse possession of such island, since such privilege is a right which attaches to the ownership of the land on the opposite side of the old channel, and can be acquired only by obtaining title to such land.

Fishing Privilege—Acquisition by Adverse Possession.—Under Statutes of 1859, page 298, section 5, which declares that any person who shall cast, haul or draw any seine or net, not having the right to do so, shall be deemed a trespasser, and may be convicted of a misdemeanor, a person cannot acquire a fishing privilege by adverse possession, since the violation of a penal statute, no matter how long continued, cannot confer a legal right.

APPEAL from Superior Court, Humboldt County; G. W. Hunter, Judge.

Action by Ezekiel M. Heckman against John A. Swett and others to quiet title to a fishing privilege and for an injunction. From a judgment for defendants, plaintiff appeals. Reversed.

Horace L. Smith for appellant; P. F. Hart and E. W. Wilson for respondents.

HAYNES, C.—Action to quiet title to a fishing privilege, and for an injunction. Findings and judgments were in favor of defendants, and the plaintiff appeals from the judgment upon the judgment-roll and a bill of exceptions. Plaintiff is the owner of certain lands on the north side of Eel river, known as "Swamp Land Survey No. 45," patented by the state to plaintiff's grantor in 1882. Defendants are owners, severally, of lots 36 and 42, swamp land surveys, which lots were surveyed in April, 1858. Lot 36 was patented in 1871, and lot 42 in 1880. At the time of the survey these lots were wholly on the south side of Eel river, a navigable river in which the tide ebbs and flows, and were described in the surveys and patents as bounded on that river, the courses and distances, including the meander lines on the river and navigable sloughs, and the number of acres, being also given. The court, after finding the foregoing facts, made the following finding: "(4) That Eel river is a navigable stream, and in which the tide ebbs and flows daily; that, at the date of the

said several surveys, applications and purchases as aforesaid, of said lands particularly set forth and described in findings 1, 2 and 3, the said Eel river bounded the said lands of plaintiff particularly described and set forth in said finding 1 upon the south side thereof, and the said lands of the said defendants particularly described and set forth in said findings 2 and 3 upon the north side thereof; that in the winter of 1861 and 1862 there occurred a sudden, unusual and excessive rise or freshet in the waters of said Eel river, and during which a large portion of the said lands hereinbefore, in findings 2 and 3, particularly described and set forth, with other lands along said river, were submerged or covered with water; that said rise or freshet continued for several days, and during its continuance a very considerable part of the most northern portion of the said lands described and set forth in said findings 2 and 3 as aforesaid was cut, washed and carried away; that such cutting, washing and carrying away was not slow, gradual and imperceptible in its progress, but, upon the contrary, the same was rapid, sudden and perceptible, and its loss could be plainly seen and perceived; that blocks or masses of earth caved off this land, and fell into the river, and were washed and carried away; that houses and outbuildings thereon were also washed and carried away with the land, so rapid was the same done; that said rise or freshet continued for several days; and that, upon the subsidence in the waters of said Eel river, the same was found to have cut for itself a new channel, and the main channel thereof was then running about a quarter of a mile south of the old channel, and through and over the lands of said defendants hereinbefore, in said findings 2 and 3, particularly described and set forth, whereby a portion of said lands thus described were left upon the south bank of Eel river as thus changed, and a portion thereof upon the north bank of said river as thus changed, thereby forming a small island which has grown gradually and imperceptibly, but mostly downstream, until it is now nearly a quarter of a mile wide, and a little more than a quarter of a mile long, and lies between the old or original channel of Eel river and the new channel as thus formed.'' The court further found that the main body of the water has ever since flowed in the new channel; that the tide ebbs and flows through the old channel; that at high tide there are

from two to six feet of water therein, and a width of one hundred to one hundred and fifty feet; that at low tide the bed of the old channel is dry for a considerable distance between plaintiff's land and the island; that the island is about the level of the lands on either side of the river, and is not covered with water except during freshets; that by reason of the change in the channel plaintiff's lands do not front upon or extend down to the river as thus changed, but since said freshet of 1861–62 are separated from the river by the lands in controversy and by said old channel. The southerly shore of the island is suitable for landing nets, and is valuable for fishing purposes, while the bank on the south side of the present channel is abrupt, and cannot be used for that purpose; and these facts give rise to the present controversy.

An act to regulate salmon fisheries on Eel river in Humboldt county (Stats. 1859, p. 298) contains the following provisions: "Sec. 2. The owners of land fronting on the above-named river shall have exclusive right and privilege of casting, hauling, and landing seines and nets on their own water-front. For the purposes of this act, all bars and the bed of said river lying between the lines of the official survey and extreme low-water mark shall be deemed and held to be the waterfront of the land owner whose lines border on said river or run nearest thereto. Sec. 3. Where there is a bar or grade suitable for landing seines or nets on one side of the river, and a bold shore and steep, abrupt bank on the other, the owner or owners of the land embracing such bar or grade shall have the exclusive privilege of using the entire width of the river for fishing purposes at such points or places; provided always that such owner or owners shall in no wise impede or interfere with the navigation of said river. Sec. 4. Whenever on both sides of said river there is a bar or grade suitable for landing seines or nets, the owners of the land on each side of said river embracing such bars or grades shall exercise fishing privileges and rights to the center of the river at low-water mark."

Plaintiff contends that there are no private lands between his land which reaches high-water mark on the north side of the river and low-water mark on the south side of the island, and that, therefore, under the provisions of the statute above quoted, he has the exclusive right of the fishery on the south

shore of the island; while defendants claim that, by the change of the channel of the river, the southern shore of the island is within the lines of the original survey of their lots, and covered by their patents; that thereby plaintiff is excluded; and that they have the exclusive right. The island is not used by either party for any other purpose. If defendants have title under their patents, their right is clear. If they have not, plaintiff's right is clear, unless he is barred by adverse possession. We think defendants' patents only conveyed to them the lands lying south of the present channel, and did not convey any part of the island. These lands were surveyed under the act of April 28, 1855, entitled "An act to provide for the sale of the swamp and overflowed lands belonging to this state" (Stats. 1855, p. 189). By the eighteenth section the provisions of the act were limited to the swamp lands granted to the state by the act of Congress of September 28, 1850, and under that act lands owned by the state by virtue of its sovereignty, including the beds and shores of navigable streams below high-water mark, could not be sold or conveyed. The patents describe the lands conveyed as swamp land granted to the state by said act of Congress, and describe defendants' lands (lots 36 and 42) as bounded by the left or southern bank of the river. The fact that the surveys start at a point on a section or quarter section line back from the river, and give the courses and distances of all the lines, including the meander lines, along navigable sloughs and the bank of the river, does not control the call for the south bank of the stream. Such survey was necessary in order to ascertain the number of acres contained in each lot. Though both these surveys were made, and the patent to lot 36 was issued, before the adoption of the code, the law in relation to boundaries upon navigable streams was the same as it now is. "A conveyance by the state of lands bounding upon the sea, or upon a bay or navigable stream, would extend to high-water mark": People v. Morrill, 26 Cal. 357; Civ. Code, sec. 830; Packer v. Bird, 71 Cal. 134, 11 Pac. 873. If defendants' contention can be sustained, it would seem to follow that under their patents they have not only acquired title to the bed of the river, but to the water which covers it: People v. Canal Appraisers, 33 N. Y. 464. The courses and distances of the survey undoubtedly include

a section of the river lying between the side lines of the survey, and these courses and distances must be resorted to if any part of the island is included. But not only does the call for a navigable river as a boundary control the calls by courses and distances, but the state could not convey under the act for the sale of swamp lands any land lying below ordinary high-water mark on a navigable stream, nor can the state, under any act that the legislature could enact, convey an absolute and unqualified title to the shore or bed of a navigable stream. Such lands are held by the state in trust for the whole people, and cannot be conveyed for any purpose not consistent with and in furtherance of the purposes of the trust. Grants may be made for the erection of wharves, docks, etc., in aid of the use of the water for purposes of navigation and commerce, "but the state cannot abdicate its trust over property in which the whole people are interested": Illinois Cent. R. Co. v. Illinois, 146 U. S. 453, 13 Sup. Ct. Rep. 110. If the state can vest absolute and unqualified title and ownership of any portion of such lands and waters in a private person, there can be no limit to such disposals until all such lands have been converted into private property, and the trust for the benefit of the public has been utterly destroyed. For these reasons, if no other, respondents' contention that the curative act of March 27, 1872 (Stats. 1871–72, p. 587), "vests in the respondents the legal title to the land embraced within their patents," cannot be sustained, if by the language just quoted counsel mean, as they evidently do, the lands embraced within the courses and distances there given. The patents conveyed to high-water mark on the southerly bank of the river as it existed at the date of the patent, or as thereafter changed by washing or cutting away by the action of the water, or by accretions added by the same agency. By apt words in the patents, they might have been made to include a portion of the island above high-water mark, but those words were not used, and we cannot supply them. What would have been the effect of the change in the channel of the river caused by the freshet of 1861–62 if the title had vested in the defendants prior to such change it is not necessary to determine. These surveys were made April 20, 1858. On April 21, 1858, the act of 1855 was repealed, reserving rights accrued thereunder. The

act of 1858 made the certificate of purchase issued by the register prima facie evidence of title. The certificates of purchase of lots 36 and 42 were issued, as shown by the patents, January 26, 1871, and April 28, 1880, respectively, and the patents were issued shortly thereafter; and section 7 of the act of 1858 expressly provided "that neither the patent provided for in this section, nor the certificate provided for in the sixth section of this act, shall have any other legal effect or force than as a quitclaim of all right, title, and interest on the part of the state''; but this quitclaim can only operate to transfer title to that which passes by the controlling calls of those instruments. We do not understand the fourth finding to state that a new channel was cut through lots 36 and 42, leaving a part of those lots intact upon the north side of the new channel, but that the channel was changed by cutting away the south bank until it reached its present location; and that part of the finding which states that a portion of these lots was left upon the north bank only means that a portion of the deposit forming the island is within the lines of the survey. If this finding is not to be so understood, it is not justified by the evidence. The island thus formed belongs to the state: Civ. Code, sec. 1016. We conclude, therefore, that plaintiff's southerly line is high-water mark on the north side of the river, which includes the old channel, and defendants' northerly line is high-water mark on the south side of the river; that the island is the property of the state; and that, as the old channel is above low-water mark, the low-water line is on the south side of the island in front of plaintiff's land, while the high-water line on the north side of the old channel is the south line of plaintiff's land, which brings him within the provisions of section 2 of the act regulating fisheries on Eel river. Nor does the plaintiff attack defendants' patents collaterally, as contended by counsel for respondents, nor attack them at all. They are conceded to be valid, and to vest in defendants title to all the land described within their controlling calls. The attack is only upon the construction sought to be placed upon them, viz., that they vested title in the defendants to a portion of the island.

The only remaining question is as to adverse possession. Upon this defense the court found that the defendants had

severally occupied and used the south shore of the island for fishing purposes exclusively, openly, and under a claim of title, for more than five years next before the commencement of the action, and that the plaintiff had not been seised or possessed of any right thereon or attached thereto within five years, or at all. Having concluded that defendants owned no part of the island, we think it must follow that they could acquire no right to the fishery by adverse possession under the facts of that possession as found by the court. The second section of the act of 1859, regulating fisheries on Eel river, grants the exclusive right to the owner of land fronting on the river. It is a right which attaches to the ownership of land as an appurtenance which passes with a conveyance of the land. If defendants had acquired title to plaintiff's land on the north side of the river by adverse possession, they would at the same time and by such acquisition of the land have also acquired the fishery, whether they had used the fishery during the period of adverse possession of the land or not. Navigable streams and the shores to ordinary high-water mark, as we have seen, are held by the state in trust for the public; but qualified rights therein may be granted so far as they are not inconsistent with, or are in aid of, the principal use, viz., for the purposes of navigation. In the absence of the act of 1859, regulating fisheries on Eel river, the right to use the shores between high and low water mark for fishing purposes was common to the people of the state. Aside from·that act, there was no statute under which the officers of the state could grant an exclusive right to a fishery of this character; and a title by prescription to the fishing privilege must therefore include the land of plaintiff, as the ownership of the land and the fishing privilege are inseparable. Not only so, but the fifth section of the act declares that any person who shall cast, haul or draw any seine or net, not having the right so to do, shall be deemed and held to be a trespasser against the person whose rights are by the act fixed and determined, but may, in addition to any civil action had thereon, be convicted of a misdemeanor for every such offense, and be punished by fine or imprisonment, or both. We know of no authority which holds that the violation of a penal statute, no matter how long continued, can confer a legal right or title.

The court further found that the defendants claimed and exercised their rights and interests severally and separately, each to a distinct part of the shore. The question of misjoinder of parties defendant was presented by demurrer and answer. The joinder of the several defendants was proper. They severally claimed rights affecting plaintiff's right appurtenant to his land, and their claim, though under different patents, was from the same source, and the injury to the plaintiff, as well as their defense to the action, depended as to each upon the same facts: Pom. Rem. & Rem. Rights, sec. 372; Fisher v. Hepburn, 48 N. Y. 41–55.

The finding that defendants are the owners of the south part of the island is not justified by the evidence, and is inconsistent with other and controlling facts found by the court, as is also the finding as to adverse possession. The judgment appealed from should be reversed.

We concur: Vanclief, C.; Searls, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment appealed from is reversed.