### UNITED STATES v. STEWART et al.
### No. 9507.

Circuit Court of Appeals, Ninth Circuit.

June 30, 1941.

Rehearing Denied Oct. 16, 1941.

706

Norman M. Littell, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., and Oscar A. Provost, Sp. Asst. to the Atty. Gen. (Philip Buettner, Atty., Office of Judge Advocate General of the Navy, of Washington, D. C., of counsel), for appellant.

Henry E. Monroe, J. M. Mannon, Jr., A. Crawford Greene, Robert L. Lipman, W. H. Spaulding, Thomas E. Palmer, and Stoney, Rouleau, Stoney & Palmer, all of San Francisco, Cal., for appellees.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

In this action the United States seeks to quiet its title to a large area of tule or marsh land claimed to be a part of Mare Island in San Pablo Bay and to have been acquired by purchase from the grantees of Victor Castro, to whom the island was granted by the Mexican Governor Alvarado in 1841. Appellees, defendants below, claim title to the land by mesne conveyances from a patentee of the state of California.

The suit, a companion case to United States v. O'Donnell, 303 U.S. 501, 58 S.Ct. 708, 82 L.Ed. 980, presents the final chapter in a century-old controversy concerning the extent and validity of the Castro grant. The O'Donnell case set at rest doubts of the validity of the grant and of the decree confirming it. That decision, however, involved a different tract and left open to inquiry a number of questions now presented.

Mare Island lies close to the mainland from which it is separated by navigable waters. For the purpose of illustration we append a drawing of the area.

"and on the north by a large tract of tule land, extending several miles in the direction of the valley of Sonoma." The owners in their negotiations with the naval board

MARE ISLAND, CALIFORNIA.

At the southeasterly extremity, between Mare Island and Carquinez Straits on the east and south and San Pablo Bay on the west, is an area of high land approximately 900 acres in extent upon which the plant of Mare Island Navy Yard is in the main located. Extending northwesterly from this upland there was, at the time of the grant, a narrow neck of swamp land which has since been widened somewhat by filling and reclamation. This isthmus, known as Survey No. 34, was the tract involved in the O'Donnell suit and was there determined to belong to the United States. Northwesterly of Survey No. 34, stretching out fanwise, is the much larger tract of swamp land known as Survey No. 569—the lands in suit. Appellees contend that Mare Island comprises only the relatively small area of upland first mentioned.

Bissell and Aspinwall acquired Castro's grant of Mare Island by mesne conveyances. In 1855, on their petition, the Board of Land Commissioners set up by the Act of March 3, 1851, c. 41, 9 Stat. 631, confirmed the grant. While the proceeding before the Land Commissioners was pending, a body of naval officers known as the Sloat Board recommended the acquisition of Mare Island as a site for a navy yard and depot. The Sloat Board in its report described the island as bounded on the east by Mare Island Straits, on the west by the Bay of San Pablo,

stated that the island contained about 900 acres of high or dry land and about 1300 acres of tule or low ground.

In December, 1852, the Secretary of the Navy made to the owners an offer to purchase "that tract of land known as Mare Island in California including all the tide or low land and marsh belonging to the same or * * * reputed or claimed to belong to the same * * * as recently surveyed and reported by a Board of Officers sent to California for the purpose of selecting a site for a Navy Yard. * * *" Accepting the offer, Bissell and his associates on Jan. 4, 1853, gave their deed of the island, and later executed a bond indemnifying the United States against possible failure of their title. The deed described the island substantially in the terms of the offer to purchase. On February 11, 1853, by executive order of the President, Mare Island was reserved "together with all its appendages of Tule or Marsh land ordinarily reputed to belong to said island * * *", for public uses. In 1854 the state of California formally consented to the purchase, and also relinquished its title and interest to "the overflowed beach, or swamp lands", on the eastern shore from the southern end to a parallel intersecting the northern point of the highlands "and extending into the waters of the bay or straits, washing the eastern shore of said highlands of the Island to

ship channel". By the same act the state ceded jurisdiction to the United States over both the highland and the overflowed portions of the eastern shore thereof. Cal. Stats. 1854, 1855, pp. 48, 49.

In 1856 the lands in the neck (Survey No. 34) were surveyed by a deputy county surveyor as swamp and overflowed lands supposedly owned by the state under the Swamp Land Act of September 28, 1850, c. 84, 9 Stat. 519. The state thereafter issued its patent to Darlington. In 1869, at the request of one Hinckley, the lands in suit were surveyed as Survey No. 569 by the county surveyor of Solano county. In 1874 the state issued its patent for the latter tract to one Pearson, assignee of Hinckley.[1] In 1883 Pearson's successors brought an action in ejectment against the Commandant of the navy yard to obtain possession of the lands in Survey No. 569. In that suit the Commandant was represented by the United States attorney and a special assistant appointed by the Attorney General. The United States was not a party. The evidence then produced showed that the lands were below the line of ordinary high tide, and Justice Field, sitting in circuit with Judge Sawyer, accordingly held that they were not included within the Castro grant. Judgment in ejectment was entered against the Commandant. San Francisco Sav. Union v. Irwin, C.C., 28 F. 708. The judgment was affirmed. 1890, 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540.

In 1896 one Cross went into possession of the lands embraced in Survey No. 569 and asked the then Commandant for permission to employ a navy yard surveyor to locate the boundary, stating that he, Cross, was about to begin the reclamation of his land. The Commandant agreed, expressing the wish "that the boundary line once established may be done so accurately that no objection will ever be raised by either of the parties interested therein". In the years 1896, 1910 and 1924 the Department of the Interior issued patents on behalf of the United States to the state of California covering all the lands embraced in Survey No. 569, as swamp lands.[2] In 1913, in compliance with a state statute, Cal.Stats. 1897, pp. 51, 52, a map of Mare Island Naval Reservation was filed with the recorder of Solano county designating only the high area and the portion embraced in Survey

No. 34. In December, 1914 the navy yard officials erected a fence along the southeasterly boundary of the lands in suit.

In the period following 1896 the private claimants constructed levees to reclaim the lands "for general agricultural purposes, stock raising." Cross lived on the lands with his family and workmen from 1898 to 1907. In recent years portions of the area in suit have been improved for use by gun clubs. A public utility company erected power lines under an easement obtained from Cross in 1911. In the later twenties a toll road was constructed under a franchise from Solano county, and a local mosquito abatement district, the boundaries of which are identical with those of Solano county, has undertaken to destroy mosquito larvae on the marsh area. The lands have been assessed and taxed for state purposes annually since 1882, and there is evidence that since 1890 a number of civil cases have been prosecuted in the state courts pertaining to them.

The present suit was begun by the United States in 1930. It resulted in a judgment for the defendants.

1. The grant to Castro was of the island named "La Yegua" (Mare Island) "in all its extent." In their petition to the Board of Land Commissioners the claimants represented the tract to be "an island and its boundaries easily defined." The decree of confirmation states: "The place of which confirmation is hereby given is situate in the bay of San Francisco, and is called 'Isla de la Yegua' or Mare Island and being an Island is bounded by the water's edge." It is the contention of the government that this decree conclusively establishes a valid title in the United States to all of the lands on the island above the line of ordinary high tide.

We are unable to see how the government's position can be successfully assailed. Mare Island lies in tidal waters. The phrase "water's edge", as here used, is synonymous with the shore and would seem clearly to call for a boundary at the line of mean high tide. "By the common law, the shore of the sea, and, of course, of arms of the sea, is the land between ordinary high and low water mark, the land over which the daily tides ebb and flow. When, therefore, the sea or a bay is named as a boundary, the line of ordinary high water mark is

---

[1] Appellees claim under Pearson.

[2] In 1928 Secretary of the Interior Work was compelled by mandamus to certify the land in Survey No. 34 for patent to the state as swamp lands. Work v. United States ex rel. O'Donnell, 57 App.D.C. 309, 23 F.2d 136.

always intended where the common law prevails." United States v. Pacheco, 2 Wall. 587, 590, 17 L.Ed. 865. And see Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 22-25, 56 S.Ct. 23, 80 L.Ed. 9; Shively v. Bowlby, 152 U.S. 1, 29, 14 S.Ct. 548, 38 L.Ed. 331.[3]

It is undisputed that the marsh lands extending northwesterly from the uplands were all above mean high tide at the time of the grant and its later confirmation. On this point appellees concede that there was no natural channel or water course extending across the neck from the inner channel to San Pablo Bay. Numerous early charts and surveys in evidence, as elucidated by the testimony of expert witnesses, show conclusively that from the southerly tip of the island to the northwesterly extremity of the marsh land there has always been on either hand a well defined shore line unbroken by mean high tide.

But appellees insist that since the grant was made under the Mexican law, that law must be looked to to determine what was granted; and that under the Mexican law the boundary between the sea shore, which was public, and the upland, which passed under private grant, was not the line of ordinary or mean high tide but the line reached by the highest tide during the year. They claim that the neck immediately adjoining the high lands was shown to be below the line of highest high water and therefore the marsh lands in question were not embraced in the grant.

■ We need not consider the factual argument beyond saying that the record leaves the matter substantially in doubt. The decree is written in English and was rendered by a tribunal which may properly be described as functioning in a common law atmosphere. It is to be presumed in the absence of internal evidence to the contrary— and the decree contains no such evidence— that the terms used were intended to bear the meaning ordinarily attached to them at common law. United States v. Pacheco, supra. As said by Mr. Justice Field in San

Francisco Sav. Union v. Irwin, supra [28 F. 713]: "By the common law—and by that law must decrees written in the English language be interpreted—the boundary of the island * * * is determined by ordinary high-water mark. The shore, which belongs to the public, is the line between that mark and low-water mark, over which the daily tides ebb and flow." And see Valentine v. Sloss, 103 Cal. 215, 219, 37 P. 326, 410. Indeed, in the cases involving decrees confirmatory of Mexican grants, where a boundary lay upon the sea or an arm of the sea, the line of ordinary high tide has, so far as we are advised, invariably been held to be the true boundary.[4]

2. Appellees urge that on the early charts and by common repute as of the middle of the last century the name "Mare Island" was applied to the high area only. They say further that the grant to Castro was a grant of a place by name, without specific boundaries; hence it covered only the land shown to have been in possession of the grantee. The application of the latter rule, it is said, excludes all of the lands in suit.

■ The showing before the Board on the matter of Castro's possession was that he placed a considerable number of horses and mares—seventy or eighty head—on the island under the care of Indian employees, and that he built a hut and corral on the upland. There is no evidence that the animals confined their grazing to the high lands, and it does not appear that they were close herded there or were excluded from the marshy land by any natural or artificial barrier. Presumably they grazed at will over the whole area, as it is commonly known that livestock find good grazing on the salt grass of marsh lands of this type after the passing of the spring season.

■■ But whatever may be the fact, there is no occasion to inquire into the extent of Castro's occupancy, or into the matter of early repute. Specific boundaries are given in the decree. It describes the area to which title is confirmed as an island bounded by the water's edge. It is now too

---

[3] In California the rule is to the same effect. Teschemacher v. Thompson, 1861, 18 Cal. 11, 79 Am.Dec. 151; Ward v. Mulford, 1867, 32 Cal. 365; More v. Massini, 1869, 37 Cal. 432, 433; People v. Morrill, 1864, 26 Cal. 336, 353, 354; Wright v. Seymour, 1886, 69 Cal. 122, 126, 127, 10 P. 323; Heckman v. Swett, 1883, 99 Cal. 303, 307, 33 P. 1099; Eichelberger v. Mills Land, etc., Co., 1908, 9 Cal.App. 628, 639, 640, 100 P. 117; Forgeus v. County of Santa Cruz, 1914, 24 Cal.App. 193, 194, 195, 140 P. 1092.

[4] See further on the general subject: Coburn v. San Mateo County, C.C., 75 F. 520; Teschemacher v. Thompson, 18 Cal. 11, 79 Am.Dec. 151; Ward v. Mulford, 32 Cal. 365; More v. Massini, 37 Cal. 432.

late to argue that the grant to Castro was not of the whole island but of a limited portion of it only. Where a decree specifies the boundaries of the tract to which title is confirmed "it is conclusive, not only on the question of title, but also as to the boundaries which it specifies." United States v. Hancock, 133 U.S. 193, 196, 10 S.Ct. 264, 265, 33 L.Ed. 601. And the decree is none the less conclusive because it may be thought that in the circumstances the Land Commissioners might well have given the grant a narrower construction than they did. United States v. Coronado Beach Co., 255 U.S. 472, 487, 488, 41 S.Ct. 378, 65 L.Ed. 736. The law on the subject is too well settled to warrant multiplication of authorities. On the classification of grants, see San Francisco v. Le Roy, 138 U.S. 656, 11 S.Ct. 364, 34 L.Ed. 1096; Higuera v. United States, 5 Wall. 827, 18 L.Ed. 469.

3. The Freeman Survey. Pursuant to the act of July 1, 1864, c. 194, § 1, 13 Stat. 332,[5] the United States surveyor-general for California, Rollins, in 1877 instructed Freeman, a deputy surveyor, to survey Mare Island in conformity with the decree. Having made his survey, Freeman filed with the surveyor-general his plat and notes and a general description of Mare Island, purportedly delineating the boundaries of the island at "the water's edge at ordinary high-water mark". By this survey the island was found to embrace both the high lands and the whole reach of tule lands here involved, namely, the area bounded by Car-

quinez Strait and San Pablo Bay on the south and southwest, Navy Yard Slough on the north, and Napa river and Mare Island Strait on the northeast.

Rollins published notice of the return of the survey the first publication being October 11, 1877. The survey and plat were retained in his office for the 90-day statutory period allowed for the filing of objections. No objection or protest was lodged during the time limited. On November 5, 1877, Ames, who had succeeded Rollins, transmitted Freeman's tracing and account to the commissioner of the general land office, who promptly authorized payment for Freeman's services. On August 6, 1879, surveyor-general Wagner, who had succeeded Ames, forwarded a copy of the survey and plat to the general land office. In his letter of transmittal Wagner stated that he considered the survey incorrect. As thus returned the survey was filed without any action being taken thereon by the commissioner.

It is the position of the government that the boundaries as fixed by this survey foreclose any further question as to the extent of Mare Island. It is contended that the 1864 Act does not require the formal endorsement on the plat of the commissioner's approval where no exception has been taken to the survey within the statutory time; and that the record shows that Freeman's work has long been accepted by the land department as the official survey of the island.

[5] The statute, after providing for publication of notice of the survey, states that if no objections are made to it the surveyor-general "shall approve the same, and transmit a copy of the survey and plat thereof to the commissioner of the general land-office at Washington, for his examination and approval; but if objections are made to said survey within the said ninety days, by any party claiming to have an interest in the tract embraced by the survey, or in any part thereof, such objections shall be reduced to writing, stating distinctly the interest of the objector, and signed by him or his attorney, and filed with the surveyor-general, together with such affidavits or other proofs as he may produce in support of the objections. At the expiration of said ninety days the surveyor-general shall transmit to the commissioner of the general land-office at Washington a copy of the survey and plat, and objections, and proofs filed with him in support of the objections, and also of any proofs produced by the claimant and filed with him in support of the survey, together with his opinion thereon; and if the survey and plat are approved by the said commissioner he shall indorse thereon a certificate of his approval. If disapproved by him, or if, in his opinion, the ends of justice would be subserved thereby, he may require a further report from the surveyor-general of California, touching the matters indicated by him, or proofs to be taken thereon, or may direct a new survey and plat to be made. Whenever the objections are disposed of, or the survey and plat are corrected, or a new survey and plat are made in conformity with his directions, he shall indorse upon the survey and plat adopted his certificate of approval. After the survey and plat have been, as hereinbefore provided, approved by the commissioner of the general land-office, it shall be the duty of the said commissioner to cause a patent to issue to the claimant as soon as practicable after such approval."

■ We are not able to agree. We think the statute requires a formal certification of the commissioner's action if in fact the survey meets with his approval. There was no such certification. Indeed, there is no satisfactory evidence that the plat was ever accepted by the department as correct. While the survey has perhaps some evidentiary value it is not conclusive.

■ Freeman included as part of Mare Island the lands lying northeasterly of Boat Cutoff or Dutchman's Slough; but charts accepted by all parties as accurate show conclusively that the bed of the continuous water course known as Boat Cutoff has always been well below the line of mean high tide. Accordingly the land lying beyond it cannot be taken as a part of Mare Island. It is a separate island.

■ 4. The trial court found that appellees and their predecessors have for fifty years possessed the land adversely under claim of right and color of title. Appellees concede, though, as they must, that the statute of limitations does not run against the sovereign and that title by prescription cannot be acquired to property of the United States.

5. The Act of March 3, 1891, 26 Stat. 1095, 1099, provides that "suits by the United States to vacate and annul any patent * * * shall only be brought within six years after the date of the issuance of such patents." Section 8. It was held below that the suit is barred by this statute in so far as cancellation is sought of the swamp land patents issued by the Department of the Interior in 1896 and 1910.

■ We think otherwise. It is settled that the 1891 act has reference only to patents issued for lands open to disposition through the general land office. It is "strictly a part of the public land laws." United States v. Minnesota, 270 U.S. 181, 196, 46 S.Ct. 298, 301, 70 L.Ed. 539, and cases there cited. In United States v. O'Donnell, supra [303 U.S. 501, 58 S.Ct. 714, 82 L.Ed. 980], the court pointed out that the Swamp Lands Act effected the transfer of an interest in the land granted "only so far as they were part of the public domain" at the time of the grant, and that the act "could not include lands which the Government had not acquired." It is clear that the department was wholly without authority to dispose of the lands in suit in the absence of legislation authorizing their sale. St. Louis Smelting Co. v. Kemp, 104 U.S. 636, 641, 646, 26 L.Ed. 875. And see Northern Pacific Ry. Co. v. United States, 227 U.S. 355, 367, 33 S.Ct. 368, 57 L.Ed. 544. Since the patents are mere nullities, United States v. Conway, 175 U.S. 60, 68, 20 S.Ct. 13, 44 L.Ed. 72, they present no impediment to the assertion of the government's title. The case of United States v. Chandler-Dunbar Co., 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881, is readily distinguishable.

■ 6. Appellees say that for a long period of time both the United States and the state of California recognized and agreed upon the southeasterly boundary of swamp land survey No. 569 as the boundary beyond which Mare Island navy yard did not extend. They claim that by the course of events what amounts to a public boundary has been established at that line between the state and federal sovereignties, the latter having jurisdiction over the naval reservation and the former exercising jurisdiction over the territory outside the reservation. Authorities are invoked holding that where a public boundary line has long been acquiesced in, that line is conclusively taken to be the correct one even if as an original matter it could be shown that the line should have been located elsewhere.[6]

The argument is too far-fetched to warrant extended comment. It appears to be an assertion in another guise of the claim of prescriptive title. We do not have here a suit between sovereign states concerning a political boundary. The issue involved is the title to real property claimed to have been acquired by the United States by private purchase. Under the constitution Congress alone has power to dispose of property of the United States. The fact that the state of California has exercised over the land the powers of a sovereign has no perceivable bearing on the question of ownership. It proves no more than that the state and county authorities indulged the mistaken assumption that the private claimants owned the land. Moreover, there never was as between the state and the United States a mutual agreement, express or implied, that the boundary of the navy yard lay at the line where the navy yard people

---

6 The principal cases cited are Oklahoma v. Texas, 272 U.S. 21, 47, 47 S.Ct. 9, 71 L.Ed. 145; Michigan v. Wisconsin, 270 U.S. 295, 46 S.Ct. 290, 70 L.Ed. 595; Indiana v. Kentucky, 136 U.S. 479, 10 S.Ct. 1051, 34 L.Ed. 329; New Mexico v. Colorado, 267 U.S. 30, 45 S.Ct. 202, 69 L.Ed. 499.

erected the fence in 1914. Down to the time of the decision in the O'Donnell case the grantees of the state were continuing to assert that the true boundary lay elsewhere, and extended litigation has been required to dispel the uncertainties overhanging the whole matter.

7. Finally, it is urged in support of the judgment that the suit by the United States is lacking in equity. This asserted defense, which, incidentally, the trial court declined to pass upon, appears to be indistinguishable from laches or equitable estoppel although those names are not applied to it. The argument is that the United States should not at this late date be allowed to prevail in view of the long-continued acquiescence of its officials in the decision in San Francisco Sav. Union v. Irwin, supra, and the later issuance to the state of the swamp land patents. In reliance on this course of conduct, it is said, appellees and their predecessors were induced to expend large sums in the reclamation and improvement of the lands.

It appears from the record that officials of the government felt that the land had been lost to the United States as the result of the decision in the Irwin case, although, as more exhaustive investigations have disclosed, the true facts were not before the court in that action. It is to be observed that the facts respecting the tidal conditions obtaining on the island were at least within the possibility of knowledge on the part of claimants willing to take note of those conditions or desirous of investigating the available evidence. Certainly, the law applicable to those conditions was announced clearly enough in the Irwin decision.

Mare Island had been acquired and was held by the United States in its sovereign capacity as part of a program of national defense. Those claiming adversely to the government knew that Congress had never relinquished title to any part of the swamp lands in dispute, if in fact these were a part of the area acquired; and they were chargeable with knowledge that the sole power to dispose of property of the United States resides in Congress. Absent an adjudication of the extent of the government's title, in a suit to which the United States was a party, it could not safely be assumed by any claimant that the swamp land patents issued to the state were to be taken for more than they might ultimately prove to be worth. St. Louis Smelting Co. v. Kemp, supra. Compare United States v. Walker River Irr. Dist., 9 Cir., 104 F.2d 334. From the beginning the rights of those claiming under the state have been shrouded in doubt and uncertainty.

It is settled beyond debate that in suits brought by the government for the protection of public rights, unauthorized conduct on the part of its officers, or arrangements or agreements by them not having the sanction of law, do not constitute a defense or give rise to an estoppel. Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791; Lee Wilson & Co. v. United States, 245 U.S. 24, 38 S.Ct. 21, 62 L.Ed. 128; Jeems Bayou Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402; Cramer v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622. The chief criticism to which responsible public officials may be subject here is the delay in seeking an authoritative determination of this long standing controversy. But, on considerations having their roots in necessary public policy, laches on the part of its officers is not imputable to the government. United States v. Beebe, 127 U.S. 338, 8 S.Ct. 1083, 32 L.Ed. 121; United States v. Kirkpatrick, 9 Wheat. 720, 6 L.Ed. 199. If we assume the existence of the equities contended for, it is nevertheless "manifest that the prayer for their enforcement is in the nature of things beyond the sphere of judicial authority however much relief on the subject may be appropriately sought from the legislative department of the government", Lee Wilson & Co. v. United States, supra [245 U.S. 24, 38 S.Ct. 23, 62 L.Ed. 128].

In respect of the lands lying northeasterly of Boat Cutoff or Dutchman's Slough the decree below is affirmed. Otherwise it is reversed.

DENMAN, Circuit Judge (concurring).

This is a concurrence in all of Judge HEALY'S opinion, despite the grossly inequitable result arising from the Government's reliance on its freedom from the defense of laches. It is peculiarly a case for Congressional remedial action, beyond the equitable powers of this court.

If we were to accept Judge Mathews' view that the district court has made a finding, in effect, that the "place" which at the time of the grant to Castro and at the time of the confirmation to Bissell and Aspinwall was called Isla de la Yegua or Mare Island did not include any land here in controversy, such a finding cannot be sustained in this

court because of the admission of appellees' brief here that:

"To avoid any misunderstanding of our position, we do not claim that there was any natural channel or water course extending across the neck from the Mare Island Straits side to the San Pablo Bay side, although some of the maps would tend to show such a break. We think that the evidence, particularly the Coast survey charts and surveys, indicates rather clearly that the marsh area in the neck was above mean or ordinary high tide, which Lieutenant Smith repeatedly testified was the shore line indicated upon the charts."

The charts referred to in this admission were made in 1850, prior to the great "slickens" deposits of the hydraulic mining of the later years of the 1850 decade.

Nor can I accept certain dictionary definitions to the effect that the word "island" does not always mean land completely surrounded by water against the applicable holding of Justice Fields' opinion in United States v. Pacheco, 2 Wall. 587, 17 L.Ed. 865, and other cases cited in Judge HEALY'S opinion.

MATHEWS, Circuit Judge (dissenting in part).

Appellant, the United States, acquired its title, if any, to the land in controversy from Bissell and Aspinwall, who acquired their title, if any, by mesne conveyances from Victor Castro, who acquired his title, if any, by grant from the Mexican government. Bissell and Aspinwall could and did convey to appellant only the land which was granted to Castro and confirmed to Bissell and Aspinwall. The land so granted and confirmed was in the decree of confirmation (May 8, 1855) described as "The place [which] is situate in the Bay of San Francisco, and is called 'Isla de la Yegua' or Mare Island and being an Island is bounded by the water's edge."

In the case at bar, the District Court found, in effect, that the "place" which at the time of the grant to Castro and at the time of the confirmation to Bissell and Aspinwall was called Isla de la Yegua or Mare Island did not include any of the land here in controversy. The finding is amply supported by evidence.

The last part of the above quoted description should be read with and construed in the light of the first part; and it should be remembered that the word "island" does not always mean land completely surrounded by water. International Dictionary, "Island," definition 2; Century Dictionary, "Island," definitions 2 and 3. "The words 'island' and 'isle' are sometimes used for a piece of land isolated during high tide or surrounded by marsh; e.g., Hayling Island, Isle of Ely." Encyclopaedia Britannica, 14th Edition, Vol. 12, p. 715.

Even now, at highest high tide, the land in controversy is completely separated by water from the land which in 1855 was called Isla de la Yegua or Mare Island. Considering the huge quantities of silt which the evidence shows—and we know judicially—have been deposited in San Francisco Bay since 1855, it is not improbable that in 1855 the two tracts were completely separated by water at ordinary high tide. Be that as it may, appellant acquired only the land which in 1855 was called Isla de la Yegua or Mare Island; and the land in controversy was not then so called.

The judgment should be affirmed.