UNITED STATES *v.* O'DONNELL ET AL.

No. 487.   Argued March 1, 2, 1938.—Decided March 28, 1938.

502

*Assistant Attorney General McFarland,* with whom
*Solicitor General Reed, Assistant Solicitor General Bell,*
and *Messrs. C. W. Leaphart, Oscar Provost* and *Philip
Buettner* were on the brief, for the United States.

*Messrs. William Stanley* and *James E. Kelby,* with
whom *Mr. Gordon Lawson* was on the brief, for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

This case involves the validity of the title of the United
States to a part of Mare Island in San Francisco Bay,

which was reserved for public purposes by Presidential Proclamation in 1850, was selected by the Secretary as a navy yard pursuant to Act of Congress, was reserved for that purpose by Presidential Order in 1853, and since 1854 has been so used.

The lands in question are in the area acquired as a result of the Mexican War by the Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922, which guaranteed the property rights of Mexicans in the annexed territory. The United States claims under deed to it in 1853 by Bissell and Aspinwall and another, who derived their title under grant of May 20, 1841, by Alvarado, Mexican Governor of California, to Castro, a Mexican citizen, of the island La Yegua (Mare Island) "in all its extent." Respondents claim under a patent issued by California to Darlington in 1857, purporting to convey the land in question as a part of the swamp or overflowed lands granted to the state by the Swamp Lands Act of Congress, Sept. 28, 1850, c. 84, 9 Stat. 519.

Upon the military occupation of California during the Mexican War the United States military commander had proclaimed officially that Mexican land titles would receive due recognition by the United States,[1] and Art. 8 of the Treaty of 1848 with Mexico declared that the property rights of Mexicans in the annexed territory should be "inviolably respected." After the admission of California to statehood, September 9, 1850, Congress adopted the Mexican Claims Act of March 3, 1851, 9 Stat. 631, which established a Board of Land Commissioners with authority, upon petition of those claiming under Mexican or Spanish grants of land in the annexed territory, to pass

---

[1] Proclamation to the Inhabitants of California, July 7, 1846, at Monterey, by Commodore John D. Sloat, 29th Cong., 2d Sess., House Doc. No. 4, pp. 644–645; Proclamation, August 17, 1846, at Ciudad de Los Angeles, by Commodore and Governor R. F. Stockton, *id.*, pp. 669–670.

upon the validity of the grants. Right to a review of the Board's determination by the district court, and the Supreme Court of the United States, was allowed the claimants and the Government. By § 12 of the Act of August 31, 1852, 10 Stat. 76, 99, the Attorney General was given authority over appeals from decisions of the Board adverse to the interests of the United States.

Bissell and Aspinwall, the grantors of the United States, filed their petition before the Board, seeking confirmation of their title under the Castro grant of May 20, 1841. After hearing evidence the Board confirmed their title by decree of May 8, 1855. Upon appeal by the United States to the district court for northern California, the decree of the Board was affirmed. Appeal by the Government to the Supreme Court of the United States, allowed by the district court April 1, 1857, was dismissed by the Government in the same year. The decree of the district court was not signed or entered until a decree *nunc pro tunc* as of March 2, 1857, was signed, filed and entered on April 15, 1930.

While the proceedings were still pending before the Board, the claimants, Bissell and Aspinwall, on December 15, 1852, executed a contract to sell Mare Island to the United States, and on January 4, 1853, for a consideration of $83,491, they joined in a deed to the United States, without covenants except for further assurance. The deed purported to convey Mare Island, "including all the Tule or low land and marsh belonging to the same or which has ever been reputed or claimed to belong to the same . . ." On February 28, 1853, they executed a bond in favor of the United States in the sum of $200,000, conditioned upon the validity of their contract and the conveyance of "the entire and absolute fee simple Estate in the said tract of land known as Mare Island." The bond recited that they "shall at all times hereafter indemnify and save harmless the United States against any claim or title

to the said tract called Mare Island and its appurtenances which may be set up by or through any person or persons claiming under Victor Castro and his assigns" and that they should "also indemnify and save harmless the United States against any adverse claim or title in any other person or persons or body politic which may within two years from the date hereof, be made and thereafter be successfully established."

The 1857 California patent to Darlington was not recorded until June 6, 1879, when one Sawyer appears to have acquired the Darlington claim. See *Sawyer* v. *Osterhaus,* 212 Fed. 765, 767. The Secretary of the Interior having found that the lands in question were swamp lands within the Swamp Lands Act of 1850, the respondents in 1928 by mandamus compelled the Secretary to certify the lands for patent to the State of California. The court, in awarding the relief sought, at the same time declared with reference to the contentions made here, "the mere issuance of patent to California determines no legal or equitable right of the United States in the premises." *Work* v. *United States ex rel. O'Donnell,* 23 F. (2d) 136, 138.

The present suit was brought by the United States in the district court for northern California to quiet its title. Respondents, by their answer, put in issue the Government's ownership of the lands in question and asserted their title as tenants in common under the Darlington grant. They specifically challenged the existence and validity of the Castro grant, the validity of the decrees of confirmation of the title of Bissell and Aspinwall, and any prescriptive title of the United States. They prayed, as affirmative relief, that their title be quieted, and in support of their prayer alleged that the lands in question were not embraced in the Castro grant and also were swamp lands which had passed to California under the Swamp Lands Act.

The trial court made findings of fact and reached conclusions of law in favor of the United States on all these issues. Upon appeal, the Court of Appeals for the Ninth Circuit reversed and decreed "that the United States has no title to the patented lands in suit, and that the title is in and quieted in" respondents. 91 F. (2d) 14. The Court of Appeals found that Alvarado, the Mexican Governor of California, had executed the purported grant of Mare Island to Castro, including the land in question, but made no finding with respect to the adverse possession of the United States found by the district court. It held that the paper signed by Alvarado was incompetent evidence of the grant to Castro because of the lack of filing or recordation of the grant in the Mexican archives, see *Berreyesa* v. *United States*, 154 U. S. 623, and that the decrees of the Board of Land Commissioners and of the district court on appeal from the Board, confirming the Castro title, were null and void and worthless as evidence because the United States had purchased the interest of the claimants Bissell and Aspinwall while the proceedings were pending before the Board. It characterized the proceeding as collusive and the action of the United States in acquiring title during its pendency as breach of a trust duty assumed under the Swamp Lands Act to convey swamp lands to California, and as in effect a fraud upon the state. It rejected the contention of the United States that the pending Board proceeding for confirmation of the Castro grant withdrew the land in question from the operation of the Swamp Lands Act, which is the source of California's and respondents' alleged title to the land, and held that the reservations of the land made by Presidential proclamations for military and naval purposes were ineffective, because California had previously acquired an inchoate title under the Swamp Lands Act.

Respondents renew here the contention made below, based on an elaborate review of the evidence, that the swamp or overflowed lands in question were below high tide and were not within the exterior boundaries of Mare Island as it was known at the time of the Castro grant, and so were not intended by the grantor to be, and were not in fact, included in the description of the grant. Resolution of this issue turns upon appraisal of the evidence and the inferences to be drawn from it. As both courts below have found against respondents on this issue we shall not reëxamine the evidence here. We accept the concurrent findings as establishing the fact that the lands in question were within the description of the deed to Castro. *United States* v. *State Investment Co.,* 264 U. S. 206, 211; *Shappirio* v. *Goldberg,* 192 U. S. 232; cf. *Page* v. *Rogers,* 211 U. S. 575; *Washington Securities Co.* v. *United States,* 234 U. S. 76; *National Bank* v. *Shackleford,* 239 U. S. 81; *Risty* v. *Chicago, R. I. & P. Ry. Co.,* 270 U. S. 378.

Nor is the fact that a patent has issued to California, in obedience to the judgment in the mandamus proceeding brought by respondents in *Work* v. *United States ex rel. O'Donnell, supra,* decisive of any issue presented here. Upon the Secretary's approval of the survey of the land in question by the United States Surveyor General for the State of California, showing the lands to be swamp and overflowed at the date of the Swamp Lands Act, and the determination by the Secretary that the lands in question were then swamp and overflowed, it became his duty under the Swamp Lands Act, and under the Act of Congress of July 23, 1866, 14 Stat. 218, to certify the lands for patent to the state. See *Tubbs* v. *Wilhoit,* 138 U. S. 134. But the adjudication in mandamus that it was the duty of the Secretary to issue the patent under these acts, and the issuance of it, determined no legal or equitable right of the United States

in the premises. It remains open to the United States in this or any other appropriate proceeding, to show that the lands did not pass under the Swamp Lands Act. *United States* v. *Schurz,* 102 U. S. 378, 404; *Smelting Co.* v. *Kemp,* 104 U. S. 636, 641, 646; *United States* v. *Conway,* 175 U. S. 60, 68, and cases cited; see *Work* v. *United States ex rel. O'Donnell, supra,* 137, 138.

We accordingly direct our attention to the question, deemed pivotal below, whether, as the Court of Appeals held, the confirmation of the title of Bissell and Aspinwall under the Castro grant by the Board of Land Commissioners was invalid, so that the United States neither reserved nor acquired a title valid as against the State of California and respondents who claim under her. In answering, it will be an aid to adequate understanding of the points in issue to consider first the effect of the confirmation by the Board, without reference to the alleged collusion and fraudulent action of the United States or any of its officers.

The Swamp Lands Act of 1850 was effective to transfer an interest in the lands described in the Act, only so far as they were part of the public domain of the United States and thus subject to the disposal of Congress. The Act in terms purported to grant to the several states all swamp and overflowed lands located within their respective boundaries "which shall remain unsold at the passage of this Act." Section 2 made it the duty of the Secretary of Interior "to make out an accurate list and plats" of the lands described by the Act and to "cause a patent to be issued to the state therefor." The effect of these provisions was to invest the state *in praesenti* with an inchoate title to those lands falling within the description of the Act, to be perfected as of the date of the Act when the land should be identified and the patent issued as provided by § 2. *Wright* v. *Roseberry,* 121 U. S. 488; *United*

*States* v. *Minnesota,* 270 U. S. 181, 202–203. By its terms the Swamp Lands Act did not include swamp lands which the Government had sold, and it could not include lands which the Government had not acquired or free any of them of obligations to which they were subject when the Act was passed. *United States* v. *Minnesota, supra,* 206.

It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose. *Wilcox* v. *Jackson,* 13 Pet. 498, 513; *Missouri, K. & T. Ry. Co.* v. *Roberts,* 152 U. S. 114, 119; *Scott* v. *Carew,* 196 U. S. 100. This has been held to be the case even though the appropriation be afterwards set aside. *Leavenworth, L. & G. R. Co.* v. *United States,* 92 U. S. 733, 741, 745; *Newhall* v. *Sanger,* 92 U. S. 761. The general words of the granting act are to be read as subject to such exception. *Scott* v. *Carew, supra,* 111, 112; *Louisiana* v. *Garfield,* 211 U. S. 70, 77; *United States* v. *Minnesota, supra,* 206.

Swamp lands in California, being a part of the territory annexed by the Treaty of Guadalupe Hidalgo, were subject to all obligations imposed upon the United States with respect to them under the principles of international law by reason of the annexation, and by its treaty obligations.[2] Article 8 of the treaty stipulated

---

[2] The obligation imposed by the principles of international law to respect property rights within annexed territory is substantially that recognized by the treaty, *Soulard* v. *United States,* 4 Pet. 511; *United States* v. *Percheman,* 7 Pet. 51, 87; *Strother* v. *Lucas,* 12 Pet. 410, 436; *United States* v. *Repentigny,* 5 Wall. 211, 260; *Knight* v. *United States Land Assn.,* 142 U. S. 161, 184, and comprehends not only formal grants "but also any concession, warrant, order or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession." *Strother* v. *Lucas, supra,* 436; see *Soulard* v. *United States, supra.*

that Mexicans then established in the annexed territory should retain their property within that area, and that property belonging to Mexicans not established there should be respected. The protocol of May 26, 1848, interpretative of the treaty, which preceded the exchange of ratifications on May 30, 1848, declared that the grants of land made by Mexico in the ceded territory "preserve the legal value which they may possess, and the grantees may cause their legitimate [titles] to be acknowledged before the American tribunals," and that "Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territories are those which were legitimate titles under the Mexican law in California . . . up to the 13th of May, 1846 . . ." 61st Cong., 1st Sess., Sen. Doc. No. 357, pp. 1119–1120.

The obligations thus assumed by the United States antedated the Swamp Lands Act and were superior to any rights derived from the United States under that Act. The obligations were political in character, to be discharged in such manner and upon such terms as the United States might deem expedient in conformity to its treaty obligations. *Beard* v. *Federy,* 3 Wall. 478; *Grisar* v. *McDowell,* 6 Wall. 363, 379; *San Francisco* v. *LeRoy,* 138 U. S. 656; *Knight* v. *United States Land Assn.,* 142 U. S. 161, 183, 184. While the treaty provided that the claimants under Mexican grants might cause their titles to be acknowledged before American tribunals, it was silent as to the mode of selection or creation of such tribunals. The United States was left free to provide for them in its own way. Cf. *United States* v. *Ferreira,* 13 How. 40, 45. It could relegate all the multitude of claims under the Mexican grants to the ordinary procedure of courts with the inevitable delays and confusion affecting land titles in the vast annexed area. See *Beard* v. *Federy,*

*supra,* 493. It could set up an administrative tribunal acting by a more summary procedure [3] designed to establish with finality the status of all the Mexican grants as of the date of annexation. It chose the latter course by the creation of the Board of Land Commissioners, by the Act of March 3, 1851.

Under that Act the General Land Office was required to issue a patent for all claims finally confirmed "by the said commissioners, or by the said District or Supreme Court." The act declared that final decision of the Board, or the district or the Supreme Court should "be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons." Lands, the claim for which should be finally rejected, and lands, claims to which should not be presented to the Board within two years of the date of the Act were to be "deemed, held, and considered as part of the public domain."

The primary purpose of the Mexican Claims Act was the performance by the United States of its treaty obligations to quiet the titles of the claimants under Spanish and Mexican grants. But a necessary consequence of proceeding before the Commission, and one incidental to the determination of the validity of the titles of such claimants, was a determination whether, by the cession, the lands in question had become a part of the public domain of the United States. It is evident that the treaty obligations to quiet the title of claimants under Mexican grants would be defeated and the Mexican Claims Act would fail of its purpose if the finality of the Board's confirmation of claims under Mexican grants could be challenged by persons claiming under grants of public lands by the United States. For that reason it has been consistently held that claimants under the United States, by virtue of statutes disposing of its public lands in Cali-

---

[3] As to the number of the claims and the celerity with which they were disposed of, see 8 Op. Atty. Gen. 515.

fornia, are not "third persons" within the meaning of the Mexican Claims Act, and that confirmation under that act of claims under Mexican grants is conclusive upon all those claiming under the United States. *Beard* v. *Federy, supra,* 493; *More* v. *Steinbach,* 127 U. S. 70; *San Francisco* v. *LeRoy, supra; Knight* v. *United States Land Assn., supra,* 184; *Ward* v. *Mulford,* 32 Cal. 365, 370; *People* v. *San Francisco,* 75 Cal. 388, 400; 17 Pac. 522; cf. *United States* v. *Coronado Beach Co.,* 255 U. S. 472, 488. Such is the effect of confirmation by the Board of titles set up under Mexican grants, upon claimants under the Swamp Lands Act to lands in the annexed territory. That the Swamp Lands Act antedated the Mexican Claims Act and the confirmation of titles under it, is immaterial; for those claiming under the Swamp Lands Act took *cum onere*— subject to the treaty obligations of the United States and whatever procedure the United States might adopt in performance of those obligations for the quieting of titles under Mexican grants. Confirmation when made was as effective and conclusive upon all patents under the Swamp Lands Act as if made at the date of the treaty. *San Francisco* v. *LeRoy, supra,* 670; *Knight* v. *United States Land Assn., supra,* 185; *Ward* v. *Mulford, supra,* 370.

We do not stop to discuss the point, much argued at the Bar and in the briefs, whether the decree of the district court affirming the Board's decree of confirmation was void or otherwise defective because not signed at or about the time it was rendered. See *Mitchell* v. *Overman,* 103 U. S. 62, 64–65; *In re Wight,* 134 U. S. 136; *United States* v. *Stollar,* 180 Fed. 910, 912, 913; *International Harvester Co.* v. *Carlson,* 217 Fed. 736, 738. If it be taken that the Government has failed to prosecute its appeal to final decree in the district court, it is enough that the decree of the Board has never been set aside or otherwise disturbed. If the appeal was not still pending when the decree of the district court was entered *nunc pro tunc* in 1930, the de-

cree of the Board remains as effective as if no appeal had been taken, and has become final and conclusive within the provisions of the Act. *Beard* v. *Federy, supra; United States* v. *Ritchie,* 17 How. 525.

Apart from the considerations growing out of the purchase by the Government of the Bissell and Aspinwall title, now to be discussed, the decree of the Board, if not that of the district court, must be taken as conclusive on respondents, and as to them it is not open to this or any other court to reëxamine the existence or validity of the Castro grant.

The holding of the court below that the acquisition by the United States of the title of Bissell and Aspinwall, while their claim was pending before the Board of Land Commissioners, involved a breach of equitable duty to California of such character as to preclude the Government from taking any advantage of the Board's confirmation of the Castro grant, is predicated upon the assumption that by virtue of the Swamp Lands Act the United States became in effect the trustee of the lands in question for the benefit of the state and its successors in interest. It is true that in a loose and general sense the United States, pending issuance of a patent under other land grant acts, has been referred to as a trustee of lands to be patented, *Cornelius* v. *Kessel,* 128 U. S. 456, 460-1; *Benson Mining & Smelting Co.* v. *Alta Mining & Smelting Co.,* 145 U. S. 428, 432; *Orchard* v. *Alexander,* 157 U. S. 372, 383; *United States* v. *Anderson,* 194 U. S. 394; *Knapp* v. *Alexander-Edgar Lumber Co.,* 237 U. S. 162; *Payne* v. *New Mexico,* 255 U. S. 367, and the right of the state, before patent, to lands within the purview of the Swamp Lands Act has been referred to as "equitable." *Michigan Land & Lumber Co.* v. *Rust,* 168 U. S. 589, 591; *Brown* v. *Hitchcock,* 173 U. S. 473, 476.

Even where the right of the state under the Swamp Lands Act is unqualified, it would perhaps be more ac-

curate to say that the United States is no more than a donor granting without warranty those lands falling within the description and the purview of the statute, subject to a duty imposed by the statute, to perfect by survey and patent such inchoate title as it had conveyed to the state. Beyond this the United States, by the enactment of the Swamp Lands Act, assumed no duty. It gave no warranty of title. It assumed no obligations to the grantee subjecting itself to other claims of equitable duty. Sale of the lands to others does not make it accountable as a trustee of the proceeds. *United States* v. *Louisiana,* 127 U. S. 182, 191. In any case, the duty assumed by the United States under the treaty and the concomitant power thus reserved to it, was inconsistent with the assumption of trust duties toward the state by reason of the Swamp Lands Act. In the execution of that duty it was free to adopt any mode of procedure it saw fit for adjudication of the titles of claimants under Mexican grants. Even after the submission of their claims to the Board of Land Commissioners it could withdraw them from decision of the Board and courts and adjudicate them by Congressional action. *Grisar* v. *McDowell, supra,* 379. The tentative recognition by the treaty of the rights of the Mexican grantees and the full latitude which the Government had reserved to itself in the choice of modes of disposition of those claims, were incompatible with the assumption of trust duties by the Government with respect to them pending their final disposition. There is thus a complete absence of support for the supposed analogy between a sovereign government, in such circumstances, and a private grantor who has conveyed with warranty of title or who has undertaken by executory contract to convey title which he possesses or subsequently acquires and who, because he has thus assumed equitable duties, is sometimes spoken of as a trustee.

The Mexican Claims Act itself neither imposed nor recognized such duties. In authorizing the Board to pass on claims presented to it upon the evidence adduced by the claimant and the United States, it required no notice to be given to any third party. It gave to the Government the right to representation by an agent and made it his duty to collect testimony "in behalf of the United States," and to attend meetings of the Board. But the rôle of the Government was not that of a litigant. It was rather, as the Act itself declared, supervisory: "to superintend the interests of the United States" in the performance, through an administrative agency, of its treaty obligation to ascertain for the Mexican claimants, and for itself, what lands had been withdrawn from the public domain by the Mexican grants. "The United States did not appear in the courts as a contentious litigant; but as a great nation, acknowledging their obligation to recognise as valid every authentic title, and soliciting exact information to direct their executive Government to comply with that obligation." *United States* v. *Fossatt,* 21 How. 445, 450, 451.

At no stage of the Government's dealing with the titles under Mexican grants, either under the Swamp Lands Act or under the Mexican Claims Act, can we find the assumption on the part of the Government of any duty toward the state with respect to the swamp and overflowed lands other than that specified in the Swamp Lands Act itself, and that duty was fully performed when it issued to the state its patent to the lands in question in response to the mandate in *Work* v. *United States ex rel. O'Donnell, supra.*

We turn now to the consideration of the circumstances relied on to establish the proposition that the title now asserted by the United States was acquired as the result of a purposeful or conscious scheme to deprive the state of possible benefits under the Swamp Lands Act by means

of collusive proceedings before the Board of Land Commissioners and the district court. At the outset it is to be noted that this contention first emerges in this case in the opinion of the Court of Appeals below. There had previously been no suggestion of such a contention in any pleading or assignment of error, nor had the Government or its officers been charged with any fraud, collusion, concealment, or bad faith. The respondents, in seeking affirmative relief, made no assertion of that character. In such a state of the record, dereliction of officers of the United States in the performance of official duty is not lightly to be inferred seventy-five years after the event, and a court should be slow to find what would be in effect a fraudulent conspiracy on their part to deprive the state of the benefits of the Swamp Lands Act.

Upon the selection of Mare Island as a navy yard by the Secretary of the Navy, Mr. Crittenden, then Attorney General, had given an opinion to the effect that Mare Island was a part of the public domain subject only to the Castro grant, the claim under which was then pending before the Board of Land Commissioners. He concluded that there was sufficient basis for the claim to justify purchase of the claimant's title, which he recommended as a protection of the interests of the Government. See Opinion of Attorney General Cushing given to the Secretary of the Navy, April 9, 1853. 8 Op. Atty. Gen. 422. Then followed the purchase from Bissell and Aspinwall, in the circumstances already detailed. Those circumstances justify no inference that the defense of their claim was dishonest. The Government had far more to gain than to lose by defeating the Castro grant. As the grant covered the island "in all its extent," both upland and swamp, rejection of the claim would not only have given to the Government a return of the purchase price and expenses as guaranteed by its bond for title, but would have established its right to the entire island as a part

of the public domain, except perhaps the swamp land. Cf. *Newhall* v. *Sanger, supra.* The validity of the Castro grant was the only matter with respect to which the Board could render a decree which, under the procedure of the Mexican Claims Act, could become final and conclusive as to the claimant and the Government. So far as appears, each was as much concerned with the determination of that question after as before the Bissell and Aspinwall deed and bond, for accordingly as it was decided one way or the other, the one or the other stood to gain an amount equal to the purchase price of the property. The reasonableness of the purchase price is not challenged. The only effect of the deed and bond was to protect the Government against loss of the opportunity to acquire the land for a navy yard in case the property should be disposed of to some third person pending the Board's decision, and the Castro grant should be upheld.

Upon the opinion of Attorney General Cushing, already mentioned, the Court of Appeals placed its chief, indeed its only reliance for the conclusion that there was conscious dereliction on the part of the Government. In this opinion the Attorney General spoke of the Government's purchase of the Bissell and Aspinwall title as an accomplished fact, but nevertheless recommended that the claim be vigorously contested. This is said to be so inconsistent with the Government's dismissal of its appeal four years later as to indicate a "purposeful shift of position" to the detriment of the state, from which bad faith is to be inferred. But an attentive reading of the opinion in the light of subsequent events reveals no such inconsistency. In repudiating any thought that the claim should not be contested, he declared: "But I, as Attorney General, in view of the special duties imposed on me by the acts for settlement of private land claims in Cali-

fornia, and of my general obligation to look after the rights of the United States in the premises, cannot pursue this course. I must not admit that the purchase of the Castro claim by the United States operates in any way, either by implication or otherwise, as a waiver of the general rights of the United States in the premises, or as an assent, either express or implied, to the pretended validity of the grant to Castro." He pointed out that the claim "involves difficult and important questions of law, which the Commissioners, to be sure, have decided in favor of the claimants,[4] but which the Supreme Court may decide otherwise," and that he felt bound to protect the interests of the United States by an appeal because as a precedent the case would affect "many millions worth of land in California, which is otherwise public domain."

After pointing out that the State of California retained title to tide land below high water mark, and that the United States could not enjoy the use of Mare Island as a naval depot while its shores belonged to the state, he concluded with the recommendation that "California be invited to relinquish to the United States whatever claim, if any, she may have to the shores or the overflowed land of Mare Island." The opinion discloses that he had no thought of depriving the state of any rights which it might have under the Swamp Lands Act for it affirmatively shows that he was of opinion (erroneously as was later decided in *Beard* v. *Federy, supra,* and cases following it), that no rights of California under the Swamp Lands Act would be affected by the decisions of the Board.

With but little research it becomes apparent that the important questions of law affecting "many millions worth of

---

[4] The reference is obviously to claimants other than Bissell and Aspinwall, for at that time there had been no hearings by the Board on the claim of the latter and the Board had rendered no decision with respect to it.

520

land in California," which were involved in the Bissell and Aspinwall claim and which the Commissioner had already decided in other cases, were unrelated to any rights of the state under the Swamp Lands Act, and were in fact decided against the Government by this Court after the Attorney General had rendered his opinion and before the dismissal of the Government's appeal from the decree of the district court in the Bissell and Aspinwall case.[5]  The opinion

[5] Of the "difficult and important questions of law" which were said in Attorney General Cushing's opinion to the Secretary of the Navy to be involved in the claim of Bissell and Aspinwall, one, mentioned in the letter itself, was whether a grant by a Mexican governor was valid in the absence of approval by the "Departmental Deputation." This question was·answered in the affirmative by the Board, December 27, 1852, in passing on the Fremont claim; January 5, 1853, in the Larkin case; and in preliminary opinions in the Cervantes and Reading cases, rendered August 3, 1852, and August 9, 1852, respectively. This Court agreed with the Board on the general proposition, in *Fremont* v. *United States*, 17 How. 542, 563 (March 10, 1855); *United States* v. *Reading*, 18 How. 1, 7–8 (January 11, 1856); *United States* v. *Larkin* 18 How. 557, 563 (May 12, 1856). A special rule to the contrary was later pronounced as to island grants in *United States* v. *Osio*, 23 How. 273, decided March 12, 1860, but it cannot be said from the present record whether that rule was applicable to the Castro grant.

Also involved in the claim of Bissell and Aspinwall were five other questions, each of which had been decided by the Board before the Attorney General's opinion of April 9, 1853, and before the Board's later confirmation of the Bissell and Aspinwall claim. Each was decided by this Court against the Government before its dismissal of the appeal which it had taken April 1, 1857, from the district court's affirmance of that confirmation. The questions were:

(a) Whether the Mexican provincial governors had power to grant lands. It was decided in the affirmative in the preliminary opinion on the Cervantes claim, rendered by the Board August 3, 1852, and in a number of subsequent decisions, and was settled by this Court March 5, 1857, in *United States* v. *Peralta*, 19 How. 343.

(b) Whether the Mexican governors had power to grant any lands within ten leagues of the seacoast—the so-called littoral league question. It was decided adversely to the Government in a preliminary

evidences the strongest motives on the Government's part to contest the Bissell and Aspinwall claim, and the firm determination to prosecute the contest with vigor. The record of the proceedings before the Board plainly shows adherence to this purpose. Witnesses were produced by the Government to discredit the Castro grant; those produced by the claimants, including Alvarado who testified to his execution of the grant, were so vigorously cross-examined as to excite the Board's "strong suspicion" as to the authenticity of the Castro grant, which it nevertheless sustained in the light of all the evidence. Only after the "important questions of law" had been decided by this Court against the Government did it relax its efforts. Its change of position then, though purposeful, can hardly be said to be evidence of bad purpose.

The deed of Bissell and Aspinwall to the Government was recorded in Solano County, California, April 18, 1853.

opinion in the Cervantes case, rendered by the Board August 3, 1852, and was settled by this Court May 12, 1856, in *Arguello* v. *United States,* 18 How. 539, and *United States* v. *Cervantes,* 18 How. 553.

(c) Whether the grantee's failure to furnish a map (*diseño*) with his petition for a grant, constitutes a fatal defect in title. It was decided by the Board adversely to the Government in the Fremont case, December 27, 1852, and was settled by this Court March 10, 1855, in *Fremont* v. *United States, supra.*

(d) Whether a grant is void for want of a condition requiring the grantee to take possession of and cultivate the land within a certain time. It was decided by the Board in the negative in the Larkin case, January 3, 1853, and was settled by this Court May 12, 1856, in *United States* v. *Larkin, supra.*

(e) Whether a grant is void for want of a clause informing the grantee that it would become indefeasible only after approval by the Departmental Deputation. It was involved in the Larkin claim, confirmed by the Board January 3, 1853, and was settled by this Court May 12, 1856, in *United States* v. *Larkin, supra.*

Chronological data have been secured from Hoffman's Land Cases, Appendix, and from the records filed in this Court in the cited cases.

The opinion of Attorney General Cushing was in October 3, 1853 transmitted by the Secretary of the Navy to the Governor of California who submitted it to the California Legislature January 4, 1854. California Senate Journal, 1854, 37; Appendix, Doc. No. 4. Being then fully advised by that opinion of the Government's purchase of the Bissell and Aspinwall claim and of its purpose to press for a determination of the validity of the Castro grant by the Board of Land Commissioners, the California Legislature by Act of May 11, 1854, Cal. Stat. 1854, c. 43, pp. 48–49, consented to the purchase of Mare Island for the purpose of establishing there a navy yard and proclaimed that all the lands within its limits were to be perpetually free of state taxation. It ceded to the Government lands on the island which are not here involved, with the proviso that the consent to the purchase and the cession to the Government should not "be construed in aid or support, directly or impliedly, of any conveyance or bond for title to the United States of the same lands heretofore made, or which may hereafter be made . . . or as a recognition on the part of the State of California of any claim, title or grant heretofore asserted or set up, or which may hereafter be asserted or set up by any person or persons . . ." The only bond for title then relating to Mare Island which is disclosed by the record was that of Bissell and Aspinwall, and the apparent purpose of the proviso was that the state's consent to the purchase should not enure to the benefit of Bissell and Aspinwall or any others in like situation, so as to relieve them from the obligation on their bond in the event that the Castro grant should be held invalid by the Board of Land Commissioners. Occupation of the island by the United States as a naval station followed in September, 1854. The Board rendered its decree of confirmation of the Castro grant May 8, 1855. The following memorandum appears among the papers in the case in the district court: "The United States being now the owner of

the titles of appellees, a confirmation of this claim enures to the benefit of the Government and no objection is there-, fore made to a decree in favor of the validity of the claim."

Thus, instead of action covertly taken by the Government with the purpose of depriving the state of any of its rights in the premises, we find high officers of the Government proclaiming in documents submitted to the Governor and Legislature of California the fact of the Government's acquisition of a conditional interest in the Bissell and Aspinwall claim, and its purpose to secure a determination of the validity of the grant by the Board of Land Commissioners. We see that, after this full disclosure, the state expressed consent to the purchase in such a way as to save to the Government unimpaired its rights under the Bissell and Aspinwall bond. Only after the confirmation of the Castro grant by the Board of Land Commissioners, and only after the important questions of law on which the Government relied to defeat the grant had been decided against it by this Court in other cases, did the Government relinquish its purpose to contest the Bissell and Aspinwall claim. We can find in this record no basis for saying that the confirmation by the Board was procured or allowed to stand through any fraud, concealment, bad faith, or breach of duty to California by the Government or its officers.

The contention that the decree of the Board is open to collateral attack as a nullity is thus reduced to the assertion that, by reason of the conditional interest of the Government under the Bissell and Aspinwall deed and bond, the contest before the Board may have been in some degree less vigorous than it otherwise would have been. To this the answer is that, as already shown, the Government owed no duty to the state to contest the claim and that in any case the proceeding before the Board was not adversary.

524

The Board was an administrative body, created as the Act declares "to ascertain and settle the private Land Claims in the State of California," by proceedings which were not required to be controversial. It was begun without notice to any other party. While the attendance by the "agent" of the United States was required in order that he might "superintend the interests of the United States," it did not appear in the rôle of litigant. *United States* v. *Fossatt, supra.* The Board was an administrative body, not a court. *United States* v. *Ritchie, supra; United States* v. *Fossatt, supra.* Review of its proceedings by direct appeal was not within the judicial power, and reëxamination of its determinations by the district court and the United States Supreme Court was sustained only on the theory that the appeal to the district court was the initiation of a suit to set aside the determination of the Board, in the course of which suit further evidence might be taken. *United States* v. *Ritchie, supra,* 533, 534; *Grisar* v. *McDowell, supra,* 375. Since the statute under which the Board was created did not require adversary proceedings, the validity of its administrative determination was unaffected by their absence. The decree of the Board, which stands undisturbed by any subsequent proceedings in the courts, cannot be disregarded as a nullity.

We conclude that the acquisition of the interest in the Bissell and Aspinwall title by the United States did not undermine that determination; that the proceedings in connection with their claim before the Board of Land Commissioners were free from fraud, bad faith, concealment or overreaching, and of any breach of duty to California on the part of the United States or its officers; and that the decree of the Board stands undisturbed as a valid administrative determination of the validity of the Castro grant and, as such, is conclusive upon the State

of California and on respondents who claim under her. The decree below must accordingly be

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.