## UNITED STATES v. STEWART et al.
### No. 2685–S.

District Court, N. D. California, S. D.
Aug. 24, 1939.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., John L. Wheeler, Sp. Atty., Department of Justice, of Los Angeles, Cal., Oscar Provost, Sp. Asst. to Atty. Gen., and Philip Buettner, Atty., Office of Judge Advocate General of the Navy, of Washington, D. C., for the United States.

Henry E. Monroe, Warren Olney, Jr., J. M. Mannon, Jr., A. Crawford Greene, Robert L. Lipman, and Warren Olney, III, all of San Francisco, Cal., for defendants Mary W. Stewart, Sears Point Toll Road Co., Bay Land Co., Field & Tule Land Co., and West End Land Co.

W. H. Spaulding and Stoney, Rouleau, Stoney & Palmer, all of San Francisco, Cal. (McCutchen, Olney, Mannon & Greene, of San Francisco, Cal., of counsel), for defendant James Irvine.

ST. SURE, District Judge.

This is a suit brought by the Government to cancel three patents issued to the State of California, and to quiet title to 7,413.48 acres of land claimed to be a part of Mare Island in San Francisco Bay.

"The lands in question are in the area acquired as a result of the Mexican War by the Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922, which guaranteed the property rights of Mexicans in the annexed territory. The United States claims under deed to it in 1853 by Bissell and Aspinwall and another, who derived their title under grant of May 20, 1841, by Alvarado, Mexican Governor of California, to Castro, a Mexican citizen, of the island La Yegua (Mare Island) 'in all its extent.'" Defendants claim under three patents issued by California in 1874, in 1896, and in 1910 respectively, "purporting to convey the land in question as a part of the swamp or overflowed lands granted to the state by the Swamp Lands Act of Congress, Sept. 28, 1850, c. 84, 9 Stat. 519, 43 U.S. C.A. §§ 982–984," hereinafter called the Swamp Lands Act. The quoted language is from United States v. O'Donnell, 303 U.S. 501, 504, 58 S.Ct. 708, 712, 82 L.Ed. 980, showing a common source of title beginning with the Treaty of Guadalupe Hidalgo to lands involved in the O'Donnell case and those in suit here, but there is no other pertinent similarity between the cases.

The lands in the O'Donnell case were within swamp and overflowed land survey No. 34 containing 164.55 acres, which this court found the United States was the owner of and ever since 1853 had occupied for military purposes in connection with a naval station and Navy Yard; that the possession of the United States had at all times been actual, open, adverse, and exclusive; that the value of the buildings, structures, and utilities placed upon the land by the Government exceeded $1,250,-000.

In the O'Donnell case the defendants "specifically challenged the existence and validity of the Castro grant, the validity of the decrees of confirmation of the title of Bissell and Aspinwall, and any prescriptive title of the United States. * * * The trial court made findings of fact and reached conclusions of law in favor of the United States on all these issues. Upon appeal, the Court of Appeals for the Ninth Circuit reversed and decreed 'that the United States has no title to the patented lands [in suit], and that the title is in and quieted in' respondents. 91 F.2d 14, 45." United States v. O'Donnell, supra. The Supreme Court reversed the Circuit Court of Appeals, thereby finally settling the question as to the validity of the Castro grant and establishing the title of the United States to the lands in survey 34.

The lands in the present case are within swamp land survey No. 569 containing, as we have seen, upwards of seven thousand acres northwest of the Island.

In its complaint the Government alleges that the United States "is the owner of and has since the year 1853, occupied as part of the Mare Island Navy Yard Reservation for public, to-wit: military and naval purposes, and has been in possession" of the lands in controversy. Having in the O'Donnell case quieted title to the lands within survey 34, the Government now claims that the adjoining lands in survey 569 are a physical part of the "Mare Island granted by the Mexican Government to Castro, purchased by the United States from Bissell and Aspinwall, assignees of Castro and set apart for a naval reservation by Executive Order of the President of the United States."[1]

To sustain its case, the Government relies upon the Castro grant, the decree of the Board of Land Commissioners in Bissell and Aspinwall v. United States, 30 Fed.Cas. page 1232, the deed from Bissell and Aspinwall to the United States, the Freeman survey made in conformity with the Act of March 3, 1851, 9 Stat. 631, and said Executive Order. The Government contends that the Freeman survey "is conclusive in determining the delineation of Mare Island in the instant case." In addition to this survey, many maps, plats, drawings, and documents were introduced in evidence in support of the Government's theory that the lands in survey 569 are part and parcel of the lands comprising survey 34 and the upland of what is commonly known as Mare Island upon which the buildings of the Navy Yard are located. The evidence is interesting but without convincing force in the face of the facts opposed to it. In other words, the Government has failed to sustain the burden of proof resting upon it.

It appearing that the lands in suit were not originally a part of Mare Island and were not embraced in the Castro grant, the reservation for naval purposes does not apply to them, and the attack upon the patents fails.

Defendants have set up in their answers affirmative defenses of (1) the statute of limitations, (2) establishment and recognition of a boundary line between surveys 34 and 569, and (3) equitable estoppel.

Defendants Mary W. Stewart et al. plead that as to two of the patents, swamp land patent No. 72 and swamp land patent No. 152, the suit is barred by Sec. 8 of the Act of March 3, 1891, which provides that "Suits by the United States to vacate and annul any patent shall only be brought within six years after the date of the issuance of such patents."[2] Patent No. 72 was issued on June 5, 1896, and patent No. 152 on February 7, 1910. The suit was commenced April 22, 1930. One patent was issued thirty-four years before suit, and the other twenty years before. Clearly, as to the lands covered by the two patents, the suit is barred by the six-year statute of limitations. The case of Unit-

---

[1] Brief for the United States, page 4.

[2] Sec. 8 of the Act of March 3, 1891, 26 Stats. 1099, 43 U.S.C.A. § 1166.

ed States v. Chandler-Dunbar Water Power Company, 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881, is directly in point, and is conclusive.

In the light of the following facts, which I think present an insuperable obstacle to the Government's case, it is unnecessary to discuss the legal phases of the second and third defenses:

1. The lands in suit prior to reclamation by the defendants and their predecessors in interest were swamp and overflowed lands within the provisions of the Swamp Lands Act through which title passed to the State of California.

2. The lands were surveyed in the year 1869 under the authority of the State, and are identified by said survey as survey No. 569 and as containing 7,413.48 acres; thereafter, on April 7, 1874, the State issued its patent conveying all of the lands to John W. Pearson.

3. Patents No. 72 and No. 152 were issued to the State of California by the United States under the provisions of Swamp Lands Act on June 5, 1896, and February 7, 1910, respectively; also on April 26, 1924, a patent, No. 937055, was issued to the State by the Government under the provision of the Swamp Lands Act. A portion of the lands in suit are included in these patents.

4. For more than fifty years last past the lands in suit have been in the actual, open, and exclusive possession of the defendants and their respective predecessors in interest.

5. In 1883 a suit was brought in the Superior Court of Solano County, State of California, afterwards removed into the United States Circuit Court, to recover possession of the very lands in suit. The title of the case is San Francisco Savings Union, Bank of California, and George A. Nourse, plaintiffs, v. John Irwin, defendant. The trial was held before Honorable Stephen J. Field, Associate Justice of the United States Supreme Court, sitting as a Circuit Judge, and Circuit Judge Lorenzo Sawyer. The court found all of the issues in favor of plaintiffs and caused judgment to be entered thereon in their favor for the possession of the premises in controversy. The opinion was written by Mr. Justice Field, and may be found in Volume 28 of the Federal Reporter, beginning at page 708.[3] The holding of the Circuit Court in the Irwin case is an important fact in this litigation. Defendant Irwin was the officer in command of the Navy Yard at the time. The United States was the real party interested as defendant. Irwin was represented by United States Attorney S. G. Hilborn, and A. L. Rhodes, whose appointment as Special Assistant United States Attorney in the case, was authorized by the Attorney General. On appeal to the United States Supreme Court the Government's interests were represented by Assistant Attorney General Maury. The

---

3 Read in connection with present litigation, the following excerpt from Mr. Justice Field's opinion is significant [28 F. 714]: "From the date of that conveyance [Bissell and Aspinwall deed] the United States have been in possession of the island, and have constructed there large and expensive buildings for the uses of the navy, including a navy-yard. They have also occasionally asserted ownership over the adjacent overflowed lands, but the acts done by them were not of a character to indicate any settled purpose of occupying the lands, or devoting them to any public uses. They have not constructed any levees to prevent their overflow, or made any efforts to reclaim the lands, or to subject them to any uses of the government. Two shanties, 10 by 12, erected in 1874 or 1875 on the lands nearly eight miles distant from the island, were soon abandoned, and no other buildings have been erected on them. It is plain that the acts which the United States are said to have done to mark their control of the overflowed lands, if done by a private party, would not bar the plaintiffs from asserting their right of possession. There was on their part no such possession as would set the statute of limitations running, and which in time might ripen into a title against the true owners. It was not open, exclusive, and continuous, such as to give notice to the owners of an intention to claim title adversely to them; and the testimony indicates that the plaintiffs were ignorant of any adverse claim on the part of the United States till a short time before the commencement of this suit. It was not accompanied by any of the ordinary acts indicating ownership, and at no time were any such acts done except in the instance mentioned, where the two shanties were constructed, but soon afterwards abandoned."

judgment of the Circuit Court was affirmed, as appears in Irwin v. San Francisco Savings Union, 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540.

6. On December 3, 1873, the Board of Supervisors of the County of Solano established Reclamation District No. 186, which included the lands in suit.

7. In 1897 L. E. Cross began the erection of levees around the lands (survey 569) thereafter also known as Island No. 1 and Cross Island. Before commencing the work, Cross advised the Commandant of the Navy Yard of his intention to reclaim, and apparently the Government consented.[4] The lands were reclaimed at an expense of $80,300, and thereafter used for agricultural purposes and the raising and pasturing of stock.

8. George Cross, son of L. E. Cross, lived upon the lands, farming them for his father from 1898 to 1907. Since the decision in the Irwin case the southeasterly line of survey 569 has been recognized as the northwesterly limit of the Mare Island reservation.[5] In 1914 the Government erected and has since maintained the present boundary line fence.

9. On March 2, 1897, California passed an act, California St.1897, p. 51, ceding to the United States exclusive jurisdiction over all lands within the State then held, occupied, or reserved by the United States for military purposes or defense, or that might hereafter be ceded or conveyed to the United States for such purposes, provided that a sufficient description by metes and bounds upon map or plan of such lands be filed in the proper office of record in the county in which the same were located. Pursuant to this Act the Government recorded in the office of the County Recorder of Solano County a map of the Mare Island Navy Yard reservation on November

---

4 The following letters were exchanged between Cross and the Commandant of the Navy Yard relative to the reclamation of the lands:

"Stockton, Cal., Dec. 5th, 1896.
"Sir:

"I intend within the next thirty days to begin the reclamation of the tule land north of the Government boundary line, and desiring no conflict with the Government or its representatives I would respectfully ask that I may, at my own expense, employ a Surveyor to locate said lines for me. I have asked Mr. Simonton of the Y & D Depmt to do the work for me, which he refuses to do without your knowledge and consent,—he being employed by the Government would naturally look out for the Government's interest as well as mine.

"Very respectfully,

"L. E. Cross.

"To Admiral W. A. Kirkland
"Commandant Mare Island Navy Yard."

Admiral Kirkland replied: "In response to your letter of the 5th inst., you are informed that we have notified the Department of Yards and Docks to grant Mr. Simonton permission to make the survey desired by you. At the same time I have directed the Civil Engineer of the Yard to extend all necessary information and keep an eye on the work in order that the boundary line once established may be done so accurately that no objections will ever be raised by either of the parties interested therein."

5 In response to inquiries from the First Assistant Secretary of the Interior relative to the limits of Mare Island, the First Assistant Secretary of the Navy replied on February 1, 1913, in part as follows:

"Originally all of the tule land adjoining and to the north of Mare Island was claimed as a part of Mare Island. This tule land had, however, been sold to the State and the question as to the ownership of about 7,413 acres was taken to court and Justice Field decided in the case of San Francisco Savings Union and others v. Irwin, in the Circuit Court, District of California, July 8, 1886, that title to the land in question rested with individuals who had purchased it from the State (see 28 F. 708). All of the land originally claimed as Mare Island coming in township 4 North, range 4 West, Mount Diablo Meridian, was covered by this decision. This decision was afterwards confirmed by the Supreme Court of the United States. See 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540.

"There is forwarded herewith blueprint of Plan R–212 which shows the present limits of Mare Island."

On August 17, 1923, First Assistant Secretary of Interior Finney gave an opinion that the title to the property comprised by swamp land survey No. 569, embracing all the lands north of survey No. 34, was lost to the United States by the decision in Irwin v. San Francisco Savings Union, 136 U.S. 578, 10 S.Ct. 1064, 34 L.Ed. 540, and that all of the swamp lands in that area should be patented to the state.

10, 1913, in Book 5 of Maps, page 4. Upon this map the northwesterly boundary of the reservation is shown as the southeasterly line of survey 569.

10. In 1926 defendant Sears Point Toll Road Co. constructed a public toll road across survey 569. The road was in course of construction for two years, is 7.3 miles long, and cost $180,000. Since the road was built a number of franchises have been granted to the Company.

11. Defendant West End Land Company paid $27,000 for its land in 1923, and has expended $25,000 in improvements. Defendant Field & Tule Land Company bought 500 acres twenty years ago, paying $25 to $35 per acre. Its improvements cost in excess of $22,500. Defendant James Irvine purchased lands in 1928 for which he paid $100,000 and in addition spent $26,000 on improvements.

12. For fifty-seven years all of the lands in suit have been taxed by the State and its political subdivisions. Since the Irwin decision in 1890 a number of civil actions have been brought and prosecuted in the courts of California, pertaining to the lands in controversy.

In addition to the facts enumerated above, there are more to the same effect that might be mentioned. All are undisputed, and in their nature indisputable. They cannot be explained away or overcome. They show that for half a century the defendants and their predecessors in interest have been in the open, exclusive, continuous possession of the lands in survey 569. The lands have been reclaimed, homes have been built upon them, and they have been farmed and used for other useful purposes. People have lived upon the lands, and like other California citizens and residents, they have performed civic duties and exercised political privileges. These facts, in my opinion, preclude the Government from ever establishing its claim to ownership and possession of the lands in suit.

I therefore find and conclude that this suit is barred by the statute of limitations as to the lands in swamp land patents 72 and 152; that the lands in suit embraced in survey 569 are not a part of Mare Island; that the United States has no title in the lands in suit, but that the title to them is in the defendants, who are entitled to a decree quieting their title.