STEWART ᴇᴛ ᴀʟ. *v.* UNITED STATES.

No. 848.   Argued April 27, 28, 1942.—Decided May 25, 1942.

*Messrs. Robert L. Lipman* and *Allan P. Matthew,* with whom *Messrs. J. M. Mannon, Jr.* and *A. Crawford Greene* were on the brief, for petitioners.

*Mr. Richard H. Demuth,* with whom *Solicitor General Fahy, Assistant Attorney General Littell,* and *Messrs. Oscar A. Provost, H. G. Ingraham,* and *Philip Buettner* were on the brief, for the United States.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This is a suit by the United States to quiet its title to a large area of tule marsh lands lying northwest of the Mare Island Navy Yard in San Pablo Bay in California. *United States* v. *O'Donnell*, 303 U. S. 501, was a similar suit to quiet the Government's title to marsh lands lying between the high land on which the Navy Yard is located and the lands in controversy, which terminated favorably to the Government. In both cases, the Government deraigned title through a grant by the Mexican Governor of California to one Castro, and certain mesne conveyances by Castro and his grantees. In both cases, the defendants claimed title under the State of California, on the theory that the State acquired the lands under the Swamp Lands Act of September 28, 1850.[1] The *O'Donnell* case involved the validity of the grant to Castro, the validity of the decree of the Board of Land Commissioners confirming that grant, the question of priority of right as between the United States as purchaser of the land granted to Castro and the State of California and its grantees under the Swamp Lands Act. The decision in that case settled these questions in favor of the Government.

In the *O'Donnell* case, it was contended that the lands there in controversy were not embraced within the grant to Castro. The District Court found against the contention and the Circuit Court of Appeals approved the finding. We refused to review the concurrent findings of the lower courts.

In the present case, the petitioners do not contest the rulings in the *O'Donnell* case. Their defences are that their lands, which they hold under patents issued for swamp and overflowed lands, under the Swamp Lands Act, were never part of the land granted to Castro by the Mexican Governor; and further that, if they were, the decision

[1] c. 84, 9 Stat. 519, 43 U. S. C. § 982.

in *San Francisco Savings Union* v. *Irwin*, 28 F. 708, affirmed 136 U. S. 578, constitutes a ruling as to their title which ought now to be followed. In addition, they claim that the action of the United States is barred by the Act of March 3, 1891,[2] which prohibits suit by the United States to annul any patent after six years from the date of issue. They also contend that laches, estoppel, and failure to undertake to do equity as a condition of obtaining the desired relief require a decree dismissing the bill.

The case was tried before the same District Judge who presided at the trial of the *O'Donnell* case. Upon the basis of the pleadings and proofs, he made, *inter alia,* the following findings of fact bearing upon the defence that the lands in controversy were not included in the grant to Castro or the confirmation thereof, and hence never passed to the United States as ultimate transferee of Castro's title:

That none of the lands involved was ever a part of Mare Island.

That none of these lands was, either at the time of the grant to Castro or at the time of the proceedings for confirmation of the grant, a part of the lands known as, or referred to as, or by the name of, Mare Island.

That none of the lands was embraced in or covered by the grant of Mare Island to Castro.

That none of the lands was ever occupied by, or in possession of, Castro.

That none of the lands was claimed as a part of, or to be a part of, Mare Island.

That none of the lands was covered by, or embraced within, the confirmation proceedings or the order of confirmation of the Board or the decree of the District Court confirming the order of confirmation of the Board.

---

[2] c. 561, § 8, 26 Stat. 1095, 1099.

That none of the lands was purchased or acquired by the United States as part of its purchase of Mare Island.

The judge also further made findings that the petitioners' title was derived from the United States through the State of California under the Swamp Lands Act. He concluded that the action was barred by the Statute of Limitations and that the United States was not the owner of the lands in suit.[3]

The Circuit Court of Appeals reversed the decree by a vote of 2 to 1.[4] The dissenting judge said: "The District Court found, in effect, that the 'place' which at the time of the grant to Castro and at the time of the confirmation to Bissell and Aspinwall was called Isla de la Yegua or Mare Island, did not include any of the land here in controversy. The finding is amply supported by evidence."

The majority of the court did not overrule the findings of the District Judge above outlined. After making a reference to the evidence, they said: "But whatever may be the fact there is no occasion to inquire into the extent of Castro's occupancy, or into the matter of early repute." They held that, whatever the extent of the Mexican grant to Castro, the decree of the Board of Land Commissioners, made pursuant to the Act of March 3, 1851,[5] established a definite boundary—the line of ordinary high water mark—which was controlling. It is conceded that a portion of the marsh lands embraced in Survey No. 34, which are the lands involved in the *O'Donnell* case, is, and has been, above ordinary high water mark. The court held that there was some land above that mark in the narrow neck of land conveyed by Survey No. 34 and

---

[3] 29 F. Supp. 59.

[4] 121 F. 2d 705.

[5] c. 41, 9 Stat. 631.

connecting the high land on which the Navy Yard is constructed with the large tract of about 7500 acres covered by Survey No. 569, which constitutes the land in this suit. Construing the decree of the Commissioners in accordance with the common law of California in force at the time of the confirmation of the Castro grant, the Court held that the tract confirmed to Castro's grantees comprised not only the high land on which the Navy Yard stands but the narrow strip to the northwestward embraced in Survey No. 34, and the large tract of tule marsh lying still farther to the northwestward embraced in Survey No. 569. On account of the importance of the questions involved, we granted certiorari.

We are of opinion that, in the light of the District Court's findings, which are undisturbed, the Circuit Court of Appeals erred in reversing the District Court's judgment. It is evident that the Circuit Court of Appeals accepted, or at least did not overrule, the findings of the District Judge. If, as we think, these findings were supported by substantial evidence, there is no principle of law which requires a decision that the decree of confirmation extended the tract actually granted to Castro so as to embrace the marsh lands, title to which is in controversy.

The record before the Commissioners shows that, on October 30, 1840, Castro petitioned that he be granted an island called "Mare Island," that the Governor *ad interim* granted his petition on October 31, 1840, and that on May 2, 1841, the Governor of the Californias, one Alvarado, confirmed Castro's ownership in fee of the same island "in all its extent," which he designated as "the Island named La Yegua." There was no evidence before the Commissioners, and none in the trial of this case, to the effect that Castro occupied any portion of the tule marsh in controversy. The testimony before the Commissioners

was devoted almost entirely to the question of the authenticity and good faith of the grant to Castro. The only evidence with respect to the size or extent of the island was that given by a witness, Vallejo, who resided near it. He testified that the island was two and one-half miles in length and contained about half a league of land. This description does not include the marsh land involved in the present case but covers only the high land where the Navy Yard is located.

The petition of Bissell and Aspinwall for a confirmation to them of title to the lands granted to Castro by the Commissioners was filed August 31, 1852. It stated that the subject of the grant was "the Island called 'Isla de la Yegua' " and asked that the Commissioners confirm to them the said "tract of land." The decree of the Commissioners, after stating that the claim was valid and the application for confirmation should be allowed, continued: "The place of which confirmation is hereby given is situate in the Bay of San Francisco and is called 'Isla de la Yegua' or Mare Island and being an Island is bounded by the water's edge."

It is undisputed that the original grant to Castro was governed by the Mexican law and that, under that law, the title of an owner of land bordering on navigable waters ran to the line of the highest high tide. The record contains evidence indicating that, at such highest tide, the neck of land to the northwestward of the high land on which the Navy Yard is located was covered, at least at certain points, by water. This fact could not alter boundaries definitely fixed by the Commission's decree, which is to be interpreted according to the common law in force in California at the time it was entered. Under the common law, the boundary would be the line of ordinary high water. But the boundary of the Mexican grant is of some significance in determining what the Mexican Gov-

ernor intended to, and did in fact, grant to Castro, especially as both grant and confirmation referred to the tract as what is named or called Mare Island.

It is to be observed that the decree of confirmation refers not to a tract of land but to a "place" and to the place which "is called" Mare Island.

At the time the decree of confirmation was entered, several early maps of the area existed which, although they did not designate Mare Island by any name, showed the high land as entirely surrounded by water. They indicate a channel across the low neck of marsh land to the westward of the high promontory on which the Navy Yard is constructed.

Coming to about the date of the grant and confirmation, we find several significant maps. One of these, made by an Army lieutenant in 1848, shows an actual break at the northerly end of the high land and indicates that, at this point, water covered the land, at least at high tide. The island thus delimited is marked on the map "Mare Island" and the low tule marsh to the northwestward is not comprehended in the area so designated. Another, made by one Ellis in 1852, marks the high land "Mares Island." All the area to the northwest of the high land, including the land in controversy, is shown as water. A third, made by one Ringgold, a Commander of the Navy in 1850, shows the swamp land to the northwest of what is now the Navy Yard tract but designates only the latter as Mare Island.

Seven United States Coast and Geodetic Survey Charts, dated respectively 1851, 1851, 1856, 1859, 1861, 1863, and 1915, designate only the high land by the name of "Mare Island." The United States Geological Survey prepared maps of the Napa quadrangle and the Mare Island quadrangle in 1902 and 1916. In each, the high land is marked Mare Island and the land in controversy is marked "Island No. 1." The State Geological Survey of California pre-

pared a map in 1873 which applies the name "Mare Island" to the high land.

*San Francisco Savings Union* v. *Irwin, supra,* was tried about 1885. The Coast and Geodetic Survey prepared a map for use in that case which shows only the high land as constituting Mare Island. In the trial of the instant case, it was testified that the land in controversy has been for some years known as "Cross Island."

Shortly before the Government purchased Mare Island, and as a basis of the purchase, a Board of Officers known as the Sloat Board reported on the island as a site for a navy yard. This report was made before the confirmation proceedings were concluded. One of the plans attached to the report purports to be a plan of Mare Island, showing its topography. The plan covers only the high land. The report states that Mare Island is "bounded on the east by Mare Island Straits which separates it from the City of Vallejo on the west by the bay of San Pablo, and on the north by a large tract of tule land, extending several miles in the direction of Sonoma." The report speaks of the "north end" of the island as more uniform than the southerly end, so that it may easily be reduced to a convenient grade. These remarks cannot well apply to the tule marsh in question. The report states that the island contains, "including the tule opposite Vallejo, about 900 acres." There is a further statement that the whole length of the island is about two miles. This describes only the high land, as the length would be about ten miles if the tule marsh in controversy were included.

The foregoing facts seem to us to furnish adequate support for a finding that what was granted to Castro was the high land known at the time as Mare Island, and not the great extent of tule marsh lying to the northwestward of the former which was apparently not occupied or claimed by Castro or commonly understood to be a part

of the land called Mare Island. All that the decree purported to confirm was the title to a "place . . . called . . . Mare Island." Even if the high land was connected by a narrow neck with the tule marsh to the northwestward, that high land might still be called an island either because the narrow neck of low marsh land to its westward was sometimes flooded or because the name "island" was colloquially applied to a piece of land which a geographer would more accurately call a peninsula.[6]

The Court of Appeals, however, held, and the Government here urges, that the facts recited are immaterial in view of the terms of the decree of confirmation. The undoubted principle that, when such a decree defines the boundaries of a tract with precision, the decree cannot be attacked on the ground that the boundaries named were erroneous,[7] is invoked. But the question remains, whether the petitioners' contention in this case amounts to such an attack. The description in the decree of confirmation is at best but a vague one. It is of a "place . . . called . . . Mare Island." If there were nothing more, it would be competent to show what was in fact the place so known or called. The Government's contention is, however, that, because the Commission added that, being an island, it was bounded by the water's edge, this supererogatory statement gives a fixed and definite boundary which overcomes any vagueness inherent in the designation of the place granted. We think no such strict

---

[6] It is common knowledge that lands not in fact surrounded by water are sometimes called islands. See, Century Dictionary; Webster's New International Dictionary; Encyclopedia Brittanica, 14th Ed., Vol. XII, p. 715; Vol. III, p. 381. And compare California State Geological Survey Map of 1873, showing lands called Deer Island, Simms Island, and Green Island.

[7] *United States* v. *Halleck*, 1 Wall. 439; *Higueras* v. *United States*, 5 Wall. 827; *United States* v. *Hancock*, 133 U. S. 193.

rule has been applied in the interpretation of deeds or, indeed, of decrees of confirmation of Mexican grants in like circumstances. On the contrary, courts have repeatedly resorted to evidence of what was commonly known and called a ranch, or lot, or other place, in order to correct erroneous boundaries stated in a deed description or a decree of confirmation.[8] Thus to explain the meaning and extent of a decree is not to attack it for error, but to reconcile all of the descriptive language used to designate the tract title to which is confirmed.

We are of opinion that the evidence in question was of probative value; that its reception and consideration did not run counter to the rule that the decree of confirmation was not open to attack by reason of erroneous description of the land confirmed, and that the proofs furnished a basis for a finding of fact that the land in controversy was not a part of that granted to Castro and confirmed to his vendees. This view renders it unnecessary to discuss the other questions presented by the petitioners. The judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

*Reversed.*

---

[8] *Parker* v. *Kane,* 22 How. 1; *United States* v. *De Haro,* 25 Fed. Cas. 803; *Piper* v. *True,* 36 Cal. 606; *Haley* v. *Amestoy,* 44 Cal. 132; *Wise* v. *Watts,* 239 F. 207.